**STATE of Missouri, Respondent,**

v.

**Bill McNEW, Appellant.**

No. 48441.

Supreme Court of Missouri,

Division No. 1.

Feb. 12, 1962.

Bradley & Noble, by Charles M. Cable, Kennett, for appellant.

Thomas F. Eagleton, Atty. Gen., Richard R. Nacy, Jr., Sp. Asst. Atty. Gen., for respondent.

WESTHUES, Judge.

Bill McNew was, by a jury, convicted on a charge of manslaughter. His punishment was fixed at three years' imprisonment in the State Penitentiary. His motion for a new trial was overruled and from the sentence imposed, he has appealed.

The case originated in Dunklin County, Missouri, where an information was filed charging McNew with murder in the second degree. On change of venue, the cause was transferred to Stoddard County where the prosecuting attorney filed an amended information reducing the charge to manslaughter. The information alleged that on October 7, 1958, McNew assaulted one P. H. Wise with his fist, striking him a mortal blow in the stomach and liver from which Wise died the next day.

The principal points briefed pertain to the sufficiency of the evidence to prove that the death of Wise was due to the assault and not due to natural causes or accident. McNew claimed he struck Wise in self defense. We find little dispute in the evidence offered by the State and by the defendant. It shows the following to have occurred.

On the evening of October 7, 1958, at about ten o'clock, Wise, the deceased, was in a restaurant referred to in the evidence as Moore's Cafe in Senath, Missouri. While Wise, Lola Brown, Mrs. Moore, operator of the cafe, and Mrs. Brown's daughter Becky were sitting at a table, McNew came to the window of the cafe and motioned for Wise to come outside. Wise took his coat and went outside to defendant's car which was occupied by a Mrs. Nadine Smithmeir. At the car there was a conversation between Wise and McNew. McNew testified that Wise had told him that Mrs. Smithmeir had been going out with other men; that he had asked Mrs. Smithmeir about that and she had denied the accusation. McNew stated that his purpose in calling Wise (whom he referred to as "P. H.") to the car was to settle that dispute. The following is McNew's version of

what occurred, including his claim of accident and self defense:

"Q I see. Now, will you tell the Jury what was said between you and P. H. when he come up there?

"A Well, he walked up there and uh, he said, uh, uh, 'What do you say, Bill?', I said, 'Well, there's a misunderstanding between Nadine and myself and we'd like to get it straightened out.', just like that. Then, uh, so he said, 'Well, what is it?' And I told him, I says, 'Well, you tell me one thing and Nadine tells me another thing and we'd like to know which one's tellin' the truth.' And so, he said, uh, 'Well,' he says, 'you can hear anything.', and I said, 'Well, yeah, that's right, but you told me one thing.', and he says, 'Well, I don't give a damn what I told you.', just like that.

"Q All right. What did he do, if anything, as he told you he didn't give a damn what he told you?

"A Well, that's when he dropped his left hand off of the car and he jammed his right hand down in his pocket.

"Q What pocket?

"A His right pocket.

"Q Front or back?

"A Front pocket.

"Q All right. Then what'd you do?

"A Well, I was standin' there with my arms crossed like this, and well, I heard rumors, so I slapped at his right hand—

"Q Backhanded?

"A Yes, sir, just backhanded. I was standin' there like that and just slapped at it backhanded like that.

"Q. And what did you do, hit his hand?

"A No, sir, I missed his hand.

"Q And where did you hit him?

"A Well, I hit him right along in here.

"Q Show me?

"A Right along in there.

"Q Right along in there?

"A Yes, sir.

"Q. He had his hand in his pocket like that?

"A Yes, sir. I slapped at his hand there and I missed it and I hit him right along in there.

"Q Why'd you strike at his hand, Billy?

"A Well, I's afraid—I was goin' to strike at his wrist. I thought he was goin' to bring out a knife.

"Q Bring out a knife?

"A Yes, sir.

"Q What'd you —you struck out to protect yourself?

"A Yes, sir."

It was the State's contention that McNew struck Wise a hard blow with his fist, not on Wise's hands or arms, but in his stomach, and that Wise made no threat or movement that justified McNew in acting in self defense. McNew claimed that he did not intend to strike Wise in the stomach but that when he, McNew, struck at Wise's arm or hand, he missed and accidentally struck Wise in the side of his body.

A number of witnesses testified for the State as to what they saw at the time of the occurrence from places nearby. As to this evidence, McNew claimed that it was dark and that a post or pole obstructed the view of these witnesses and prevented them from seeing what occurred.

Mrs. Smithmeir, defendant's companion, testified as a witness for the defense. As we see it, her evidence aided the State's

theory. Note what she said on cross-examination:

"Q Now, you saw him—just indicate now with your hand how he come back and hit, now, don't hit too hard but hit me where he hit?.

"A Where he hit him?.

"Q Yeah, here.

"A I don't know.

"Q Well, you did see him hit him, didn't you?

"A I know he hit him.

"Q Now, what did he say to him immediately when he said—I believe your testimony is when he said that 'I am not—' that 'I didn't tell a lie.', then he hit him, didn't he?

"A Yes.

"Q What else did P. H. say anything?

"A I don't know.

"Q Well, what did P. H. do?.

"A He slumped over.

"Q All right. Where were his hands now immediately before he struck him? What was he doin' there? What was P. H. doin' when he said, 'I haven't told any lie.' What was P. H. doin'?

"A He was standing right outside the door.

"Q And did he have his hand—?

"A I think so.

"Q And was his other hand where, down at his side?

"A I don't know.

"Q Did you see P. H. offer to hit Billy?

"A No, sir.

"Q Did he make any move to strike or do him any harm?

"A Not that I seen.

"Q Did you hear him utter one word or curse him or call him anything or threaten him in any way?

"A No, sir.

"Q You'd of remembered it if you'd of heard it, wouldn't you?

"A I think so."

On direct examination, this witness testified as follows:

"Q Billy told P. H. to tell you that he lied about what?

"A The misunderstanding that we had.

"Q About the misunderstanding you had?

"A (Witness nodding her head up and down.)

"Q What did P. H. say?

"A He said, 'I didn't lie.'

"Q Then what happened?

"A That's when Bill hit him.

"Q All right. Now, did you see the way Bill hit him?

"A No, I didn't. I just know he hit him."

All of the witnesses who testified about the occurrence, including defendant's witnesses, stated that after McNew hit Wise, he (Wise) "grabbed his stomach" and slumped over. A number of witnesses testified they saw defendant strike Wise with his fist in the stomach and also at the side of his head.

As to the cause of death, it was in evidence that Wise, a taxi driver, made one trip after the occurrence in question. He had a room next to the Moore Cafe. Someone heard a groaning in that room early the next morning. On investigation, Wise was found to be ill and he complained of pain in his stomach. Dr. Merriman was

called and Wise was removed to a hospital by ambulance. There an operation was performed and it was found that Wise had a torn liver and had been bleeding internally. The torn liver was sutured and Wise was given a number of blood transfusions. Wise died on that day.

Dr. Merriman testified that he found Wise in a state of shock and he had no pulse or blood pressure; that Wise complained of severe pain in his upper abdomen and both shoulders; that these pains in the shoulders were a sign of "inter-abdominal" bleeding. At the hospital, Dr. Merriman assisted a Dr. Miltenberger in performing surgery. Dr. Merriman stated that they found a tear in the liver and continued his testimony as follows:

"A The liver is a soft organ which the blood isn't under as much pressure as say it would be if you'd cut your arm or something and it has a capsule or covering around it which was torn also and it leaks rather slowly. It takes, oh, four, six, eight hours, maybe, for it to bleed enough that you lose enough blood to cause a great deal of damage. There were, oh, it's a little hard to estimate, somewhere between two and three pints of blood loose in the abdominal cavity that was coming from this tear in the liver.

\* \* \* \* \* \*

"Q Doctor, could you tell what had caused this laceration in the liver?

"A Some sort of trauma.

\* \* \* \* \* \*

"Q Now Doctor, after the surgery then what happened to Mr. Wise?

"A He was transferred to the floor of the hospital there and his blood pressure fluctuated up and down. He was given more blood transfusions and so forth and finally expired."

Defendant claims under points I, II, and III that the State failed to prove "all of the elements of the crime alleged"; failed to prove that "death was not due to natural causes or accident"; and failed to prove that death was "the result of Defendant's criminal agency and not accidental." All of these elements were supported by substantial evidence. The question of whether they were proved beyond a reasonable doubt was in these circumstances a question of fact for a jury and not a question of law.

■ That the defendant struck a hard blow was supported by the evidence of all witnesses who saw the assault. Even the defendant, in his evidence, testified that Wise, after he was hit, "just kind of grunted, you know, and just kind of tilted forward a bit." Mrs. Smithmeir, defendant's witness, stated that when McNew hit Wise, "He (Wise) grabbed his stomach and kinda slumped over." She stated further, "I heard Bill (McNew) ask him if he wanted him to take him to the doctor." Dr. Merriman testified that the tear in the liver was caused by trauma. Then the doctor was asked a hypothetical question, the substance of which was whether the injury could have been caused by a blow with a man's fist and the doctor answered that it could have. We find that all of the elements of manslaughter were supported by substantial evidence.

■ Under point IV, defendant complains of "instruction Number 5 because it omits, and discounts by emphasis in related instruction, the defense of accident and misfortune." The instruction reads, in part, as follows: "The Court instructs the jury that if you find and believe from the evidence beyond a reasonable doubt that the defendant Bill McNew at and in Dunklin County, Missouri, on the 7th day of October, 1958, under such circumstances that it is not justifiable homicide or excusable homicide as said terms are defined in other instructions, and not in the lawful defense of his person as defined in other instructions, did unlawfully and feloniously with his fist, strike and hit the said decedent P. H. Wise in the stomach of the said P. H. Wise, \* \* \*."

The trial court gave an instruction (No. 14) on accident which submitted defendant's theory that if defendant struck Wise without any intention to kill or do great bodily harm "and that by accident and misfortune the death of the said P. H. Wise resulted thereby, if you so find, then you will acquit the Defendant." The court also gave an instruction (No. 7) defining excusable homicide as "the accidental killing of another." By another instruction (No. 9), the court submitted defendant's theory of self defense or justifiable homicide.

Defendant, in his argument in the brief, says, "Appellant submits that the giving of instruction Number 5 which fails to mention the word 'accidental' and the defense of 'accidental killing' except obliquely and indirectly, and following this instruction with instruction Number 8, which completely omits any reference to defenses, misled and confused the jury to Appellant's prejudice."

■ The instructions given by the trial court fully covered all of the defendant's theories, that is, self defense, accident, and that the defendant's act did not cause death. The jury was instructed that to convict the defendant the State was required to prove beyond a reasonable doubt that McNew's assault was the cause of death. We find no deficiency in the instructions. We further find that the evidence justified the jury in finding the defendant guilty of manslaughter. The instructions given in this case are not subject to the criticism concerning instruction No. 3 given in the case of State v. Kinard, Mo., 245 S.W.2d 890, 891, 892(2, 3). Instruction No. 8, given in the present case, was a common-assault instruction. No reference was made in this instruction to self defense or accident. Since McNew was found guilty of manslaughter and the instructions were complete in the submission of that offense, any deficiency in the common-assault instruction was immaterial and not prejudicial to the defendant. State v. Swiney, Mo., 296 S. W.2d 112, loc. cit. 116(16). In State v. Winn, Mo., 324 S.W.2d 637, cited by the defendant, the instruction held to be erroneous submitted the question of whether the defendant was guilty of the offense of which he was convicted by a jury. The case is not in point.

■ In two assignments of error, as briefed, defendant complains of the admission in evidence of two exhibits: One, Exhibit A, was a photograph taken in the daytime at the scene of the alleged occurrence; the second, Exhibit B, was a picture of the deceased. Neither of these exhibits was filed with the record in this case. However, we hold the trial court did not err in the admission of those exhibits. The only objection to Exhibit A was that it did not accurately portray the scene of the alleged crime. The jury had before it the evidence of the point from which this photograph was taken and the fact that it was taken in the daytime. Defendant introduced a photograph, Exhibit 1, taken at night and claimed that this exhibit portrayed the scene accurately. It was for a jury to decide what the true situation was. Furthermore, as we understand, the only purpose of defendant in producing the photograph was to show that the State's witnesses could not have seen the alleged assault because of darkness and the location of a post or pole which it was claimed obstructed the view of the witnesses. This was also for the jury to determine in considering the value and weight to be given the evidence of those witnesses. It was not very important since there was little dispute in the evidence. The assault was admitted. The dispute was, did McNew strike Wise with the back of his hand or with his fist?

■ Defendant says that the photograph of Wise should not have been admitted because it was not relevant to any issue in the case. The record does not support defendant on this point. The defendant, as well as the State, asked questions of witnesses concerning the height, size, and weight of both McNew and Wise. The photograph was therefore a proper exhibit to be in evidence.

. In the last point briefed, defendant says the trial court erred in sustaining an objection to testimony offered by defendant that the State's witness, Lola Brown, dated and was friendly to Wise; that such evidence would have tended to show bias or interest of this witness; that this witness was the only witness who testified that defendant struck Wise in the stomach. In this the defendant is mistaken. All of the witnesses, including the defendant, testified that Wise slumped forward when struck. The defendant stated he intended to strike Wise's hand but missed and unintentionally struck his side. When Lola Brown was being cross-examined, she was asked if she had not been in a car with Wise. Lola answered that she had been as a taxi passenger. She was then asked if at other times she had been with [Wise when she had not hired him and Lola stated that she had not. It was in evidence that Wise, when he was called from the cafe, was sitting at a table with Lola Brown and others; that after the altercation, Wise took Lola and her two daughters home in his taxi.

While defendant was on the witness stand, he was asked whether or not Lola Brown had been keeping company with P. H. Wise. An objection to that question was sustained. Defendant then made an offer of proof that Wise and Lola had been seen together. The trial court ruled as follows:

"By the Court: You didn't ask her if she dated him or anything like that. No, no, I'll have to sustain that objection."

 It is our opinion that the record plainly shows that Lola Brown was friendly with Wise. However, the evidence offered and rejected would have added little to what was then before the jury. Furthermore, the defendant's own evidence was that he struck Wise in the side of his body with the back of his hand. Lola Brown testified defendant used his fist. Does it make any difference which version of the oc-currence was correct? We think not. In the circumstances, the trial court's ruling was not prejudicial to the rights of the defendant. 98 C.J.S. Witnesses § 547, p. 489. A trial court has some discretion in limiting the examination on matters showing the interest of witnesses. 98 C.J.S. Witnesses § 568i, p. 527.

We have reviewed all of the points briefed and also those matters which are required to be examined under S.Ct. Rule 28.-02, V.A.M.R. We have discovered no prejudicial error.

The judgment is affirmed.

All concur.