**STATE of Missouri, Respondent,**

v.

**Leon D. CURRY, Appellant.**

No. 49810.

Supreme Court of Missouri,

Division No. 1.

Nov. 11, 1963.

2

James A. Bell, St. Louis, attorney for appellant.

Thomas F. Eagleton, Atty. Gen., Jefferson City, James J. Sauter, Special Asst. Atty. Gen., St. Louis, attorneys for respondent.

DALTON, Presiding Judge.

Defendant was charged and convicted of the offense of manslaughter and the jury assessed his punishment at two years' imprisonment in the state penitentiary. See Sections 559.070 and 559.140 RSMo 1959. He has taken an appeal to this Court.

■■ The offense in question is a felony and not a degree of murder, but a distinct offense in which malice and premeditation are not involved. State v. Foster, Mo.Sup., 338 S.W.2d 892, 896; State v. Dill, Mo.Sup., 282 S.W.2d 456, 462. In determining the sufficiency of the evidence to support a conviction we consider only the evidence favorable to the State and such favorable inferences as may be reasonably drawn therefrom, disregarding evidence that may be unfavorable to the State. State v. Fuller, Mo.Sup., 302 S.W.2d 906, 908[1].

The evidence tended to show that Mrs. Jewel Wheeler, a divorcee and the mother of several children, resided with her parents at 5726 Chamberlain, in the City of

St. Louis; and that she was employed at the Stix "Riverroads" Store. For three or four years she had been keeping company with the defendant, who was employed at the United States Post Office in said city as a special delivery messenger, working from 3:30 p. m. until midnight. Defendant was 42 years of age and resided with his wife and six children at 5869 Julian, only a few blocks from Mrs. Wheeler's residence. Mrs. Wheeler had also been keeping company for some years with James Blanks, a school teacher. His age and residence do not appear but there was testimony that he weighed from 200 to 210 pounds, and was a rather chunky fellow—five feet eight inches tall. Defendant and James, prior to the date in question here, had had some personal difficulties with reference to their respective relationships with Mrs. Wheeler.

Some weeks before Christmas, 1961, Mrs. Wheeler advised defendant that she was not going to see him any more because she was going to marry James. At that time defendant told her that she was not going to stop seeing him (defendant) until he was ready to stop seeing her. He thereafter continued to take her to work three or four times per week, and during the Christmas holidays, when she was a part-time employee at the United States Post Office, defendant regularly took her to work there. Defendant gave Mrs. Wheeler a hundred dollars in money at Christmas, 1961, and he continued to be a frequent visitor in her home and he had New Year's dinner with her family. During this same period, Mrs. Wheeler continued to "keep company" with James and he frequently picked her up at her place of work and took her to her house.

On February 6, 1962, defendant took Mrs. Wheeler, at her request, from her home to her place of employment at the "riverroads" store and he asked to see her that night. She told him she could neither see him nor go with him to a mentioned social gathering that evening on account of the illness of one of her children. However, that evening she left her place of work about 9:45 p. m. and returned to her home with a near neighbor, and, immediately after arrival, she called James and, subsequently, made arrangements to meet him that evening at the corner of Clara and Chamberlain. James, however, failed to meet her at that point and she had started back to her home when James arrived and picked her up. He was then driving a new car, a Thunderbird, that he had just purchased. The parties then visited several taverns, including the Leopard Room and Al's Sportsman's Lounge, on Union Avenue and had several drinks. Thereafter, about 12:30 a. m., they parked about a block away from her home and were seated in the automobile talking, when defendant drove by in his automobile.

When defendant left his place of employment at midnight on February 6, 1962, he visited several taverns, looking for Mrs. Wheeler but had failed to locate her. He also noted that there were no lights on at her home. On seeing Blanks' car parked on Chamberlain, and noting that Mrs. Wheeler was seated therein with James, the defendant backed his car, turned off the lights and drove up immediately behind Blanks' car. Thereupon, James advised Mrs. Wheeler that defendant was "acting awfully suspicious" and she suggested that she be taken to her home. James then drove to her home and stopped in front of it and both had gotten out and had started to the house when defendant drove up, pulled his car to the curb and again parked immediately behind Blanks' car. He then shouted to the parties, "Don't go in the house." He got out of his car and ran rapidly toward them and said to Mrs. Wheeler, "I told you to keep him off this street." He then immediately started to fight James and struck him with his fists. James began backing up, trying to fight back and to protect himself from defendant. Mrs. Wheeler endeavored to separate them, but was pushed away and the fighting continued into the adjoining yard, when

James stumbled or tripped on something and fell to the ground on his back. One of his legs was extended and the other one was up, and defendant fell on top of him. While defendant was on top of James he was hitting him with both fists. Mrs. Wheeler grabbed the defendant by the collar and pulled him off and, as she did so, she saw that defendant had a knife in his right hand. She struck defendant with her pocketbook and told him to get away. He went and got in his car and, shortly thereafter, left. James got up off the ground and started to walk, but before Mrs. Wheeler could reach him, he fell and although she tried to get him up again, she could not do so. A neighbor came and helped, but they could not get him up. He was weak and bleeding, there was blood on the ground where he was lying and he kept saying he was cold and was choking. The police were called, and an ambulance secured and James was taken to the Homer Phillips Hospital, where he was found to be dead. A postmortem examination of his body was made by the coroner's physician who found that the deceased had a stab wound in his right thigh. The point of entrance was posteriorly in the middle third of the right thigh and the point of exit was on the medial aspect of the thigh at about the same level. The wound extended across the leg and cut completely through the femoral artery, which is a major artery of the lower extremity and carries a great amount of blood. There was testimony that, as a result of its severance there would be a tremendous amount of hemorrhage, and if not immediately stopped it would produce death within five or six minutes. There was also evidence that the hemorrhage had produced death.

A police laboratory serologist, to whom deceased's clothes were delivered, found an open pocket knife with blood on it in deceased's overcoat. The knife was found at the bottom and right front of the coat, between the lining and the cloth of the coat itself. Below the second button of the coat, there was a cut or puncture mark through both sides of the coat and there were two holes in the back of the coat below the belt, also a cut on the left sleeve. The L-shaped smaller cut penetrated both sides of the coat, "the coat and the lining." This hole was seven inches from the bottom edge of the coat. There was much blood on the coat and on the knife. There was also a cut or hole in the shirt six inches above the bottom hem, corresponding to the hole in the coat. The shorts also had a slit hole five inches below the waistband in the center of the back.

Defendant, testifying in his own behalf, admitted that he stopped James and Mrs. Wheeler as they approached her home. He claimed that James advanced toward him and placed his hand in his coat pocket and defendant then pulled his knife and swung it in front of himself to keep James away. He said they struggled and locked together, moving approximately forty to fifty feet; that James stumbled and they fell to the ground and defendant fell on him; and that James took his feet and pushed him (defendant) off; also, that Mrs. Wheeler pulled defendant off of James. He admitted swinging the knife at James, but denied stabbing him. He said that if he cut James he didn't know it; that there was no blood on his knife. He claimed that he feared deceased because he had been told on several occasions that James carried a gun and James had previously threatened him.

■ We construe appellant's first and second assignments under Points and Authorities to assign error on the court's failure to direct a judgment of acquittal at the close of all the evidence. See Supreme Court Rule 26.10, V.A.M.R. Under these points appellant contends that the State failed to sustain its burden of proof and failed to show that deceased's death resulted from the wilful and felonious acts of defendant. Section 559.070 RSMo 1959 provides that: "Every killing of a human being by the act, procurement or culpable

negligence of another, not herein declared to be murder or excusable or justifiable homicide, shall be deemed manslaughter." Manslaughter has also been defined as the unjustifiable, inexcusable and intentional killing of a human being without deliberation, premeditation and malice. State v. Stringer, 357 Mo. 978, 211 S.W.2d 925, 927. On the record presented here, insofar as the State's case is concerned, no legal justification appears for the killing of James Blanks, and the evidence was entirely sufficient to show that appellant "wilfully and unlawfully" killed him. State v. Fuller, supra, 302 S.W.2d 906, 908; State v. Reeves, Mo.Sup., 195 S.W. 1027, 1029; State v. Holliday, 353 Mo. 397, 182 S. W.2d 553, 554; State v. Foster, supra; State v. Dill, supra; State v. McNew, Mo. Sup., 353 S.W.2d 571, 575.

■ Appellant further contends that the court unreasonably limited defendant in his cross-examination of the State's witness Wheeler. He first says that the court erred in refusing to allow him to cross-examine said witness as to whether or not she had testified before the grand jury. It had previously been shown that she had talked to the police officers and had given them a statement of her version of the facts. She had also testified at the coroner's inquest and it was subsequently shown that she had given a statement to the circuit attorney and that her deposition had also been taken by defendant. When defendant's counsel asked her if she testified before the grand jury, the State objected on the ground that it was irrelevant and immaterial, and the objection was sustained. Counsel then made what he calls an offer of proof by stating that he was laying a foundation for leave to file a subpoena duces tecum for her statement, saying that he had a right to look at the statement "for certain inconsistencies that she may have given." The court asked if counsel knew of any inconsistencies and he replied that "he had no way of knowing" because the court had refused to let him ask whether or not she had testified.

The objection was sustained on the ground that it "concerns Grand Jury testimony." Appellant cites State v. Thompson, Mo. Sup., 280 S.W.2d 838, 840, which merely holds that a defendant is entitled to a reasonable cross-examination of a State's witness for the purpose of impeachment by showing prior inconsistent statements and to lay a proper foundation for impeachment. Appellant also cites State v. Laspy, Mo.Sup., 298 S.W.2d 357, 359, to the effect that counsel may show on cross-examination that the witness has made prior inconsistent statements and that the witness may be impeached by proof of prior contradictory statements made before a grand jury. The cases cited have no application to the facts before us, or to the so-called "offer of proof." It is apparent that appellant's cross-examination of this witness was not with reference to laying a proper foundation for impeachment, since counsel admitted that he knew of no prior inconsistent statements. The matter was within the court's discretion, since it is apparent that counsel was embarking upon "a fishing expedition." State ex rel. Clagett v. James, Mo.Sup., 327 S.W.2d 278; Supreme Court Rule 24.24.

■ Appellant further contends that the court unreasonably limited his cross-examination of the witness by refusing to permit him to inquire "as to how many different statements she had given." Appellant says that this information was sought for the purpose of laying "a foundation to impeach" the witness, but again the witness was not being asked with reference to any conflicting or different testimony or statements she may have made in either the statement to the police, the coroner, the grand jury or in her deposition testimony of May 24, 1962. No basis for impeachment appears, nor did the question purport to lay any foundation for any impeachment. Appellant cites Miller v. Multiplex Faucet Co., Mo.Sup., 315 S.W. 2d 224; Fisher v. Williams, Mo.Sup., 327 S.W.2d 256, 262. The authorities do not support the assignment.

**6**

■ Appellant further contends that the court erred in sustaining objections to questions as follows: (1) whether or not the witness was going with a man by the name of Livingstone; and (2) "as to how many different boy friends she had at the time of the death of Blanks." Defendant insists that the questions call for facts which go to her credibility and show her character. It is apparent that the fact she was going with a man by the name of Livingstone, whom she admitted knowing, or had many boy friends would have been irrelevant and immaterial to the issues before the court and if, as appellant contends, the questions were asked for the sole purpose of establishing facts showing her character, and to affect her credibility as a witness, the objections were properly sustained. If we assume that counsel's purpose was to show that her reputation for morality was bad, he is confronted by the rule that the credibility of a witness in a criminal case cannot be impeached by showing that his or her reputation for morality is bad, but such an attack must be addressed directly to his or her reputation for truth and veracity. State v. Cox, Mo.Sup., 352 S.W.2d 665, 673; State v. Kain, Mo.Sup., 330 S.W.2d 842, 845 [3]. If, on the other hand, counsel sought to impeach the witness by specific acts or habits assumed to be immoral, or to affect her credibility by such specific acts, he was confronted by the rule that a defendant is only entitled to a reasonable cross-examination of opposing witnesses for the purpose of impeachment or otherwise, and he is entitled to only a reasonable latitude in cross-examination in order to place the witness in a proper setting and to show material ultimate facts for such purpose, but he is not entitled to show details or matters of trivial or minor importance, and the extent of such cross-examination on collateral matters for the purpose of impeachment is, to a large extent, within the court's discretion. State v. Winn, Mo.Sup., 324 S.W.2d 637, 642 [6–10]; and see State v. Stidham, Mo.Sup.,

305 S.W.2d 7, 13[8, 9]. No abuse of the court's discretion appears.

■ Appellant next contends that the court erred in sustaining the State's objection to a question as to whether or not witness Wheeler was "in love with James Blanks." Objection was made and sustained on the ground that the question was directed to irrelevant and immaterial matters. No offer of proof was made and we can only assume what the answer would have been; however, appellant now contends that he was seeking to show bias or prejudice in favor of the State by reason of the feelings of the witness toward the deceased. Appellant cites State v. Pigques, Mo.Sup., 310 S.W.2d 942, 947[7, 8] where the rule is stated, as follows: "The interest or bias of a witness and his relation to or feeling toward a party are never irrelevant matters * * *." Proof of bias or prejudice in favor of or against any of the parties to an action may properly be shown and considered as bearing upon the credit which should be accorded the witness' testimony. If we assume that the trial court abused its discretion and erred in refusing to permit the witness to answer the question as to whether she was in love with deceased, it was not necessarily prejudicial to defendant, since the witness had previously testified that she had been going with Blanks for several years; that he had asked her to marry him; "and that she was planning to do so."

While the witness was not permitted to answer the question, "Were you in love with James Blanks?" nevertheless, counsel for appellant thereupon proceeded, as follows: "You testified that you and Blanks were engaged to be married?" A. "Yes, sir." Q. "And I gather, by that, you were in love with him." The witness was not permitted to answer this question; however, we think the jury would assume, as did counsel, that the witness' attitude toward the deceased was sufficiently shown by the evidence previously presented and

subsequent testimony in the record. We must and do hold that the error was not prejudicial to appellant.

Appellant further contends that the court erred in unreasonably limiting his cross-examination of Mrs. Wheeler; that the court refused to let him lay a foundation for the production and inspection of statements given by the witness, since the evidence showed that the witness had given at least three different statements "conflicting with her testimony"; and that the court erred in overruling defendant's motion for production and inspection of her prior statements.

The record shows that before the State's case had been completed appellant filed a written application for the State to produce for inspection a copy of the Wheeler statement to the police and a copy of her testimony before the grand jury. Counsel stated that he wanted these copies "to prove that she has made conflicting statements." Counsel then stated that the witness in her deposition had said that defendant was "kneeling over James"; that in the police report she had said, "he was bending over James when James was lying down"; that in the coroner's report she had said, "that defendant was on top of James"; that in her testimony at the trial she had said that defendant "was in between James' legs"; and that counsel was entitled to a copy of the statements "in order to make his cross-examination" of the witness. The court properly held that no foundation had been laid for the showing of prior inconsistent statements, since counsel had not asked the witness about any of the alleged statements said to conflict with her testimony before the jury. The court further ruled that counsel was "obviously fishing" and overruled the motion to produce. It is clear from a reading of this record that no proper foundation had been made for the production and inspection of the mentioned statements and the court did not err in denying the motion. The matter was within the court's discretion in determining whether good

cause existed for the production of the several documents. State v. Kelton, Mo. Sup., 299 S.W.2d 493, 497[10, 11]; State ex rel. Phelps v. McQueen, Mo.Sup., 296 S.W.2d 85, 89[1]. It further appears that the alleged discrepancies in the witness' testimony to which counsel referred were of limited importance insofar as the issues before the court were concerned and particularly in view of the witness' detailed testimony before the jury. Further, the pages of the transcript to which appellant refers fail to show that any proper attempt was made "to lay a foundation" for the production and inspection of any documents. See Supreme Court Rules 24.24 and 25.19.

Appellant further contends that the court erred in limiting the cross-examination of witness Wheeler by sustaining an objection to a question with reference to what she had told the police with reference to where she met Blanks on the evening of February 6, 1962, and as to whether she had given the circuit attorney's office a different statement from what she had given the police.

After an extended and detailed cross-examination as to exactly where witness had met the deceased and after she had testified repeatedly that she had agreed to meet him at the corner of Chamberlain and Clara, but that she went there and missed him, returned to her house and later started back to the corner again, whereupon she met the deceased in front of the house next door to where she lived, counsel asked the witness what she had told one of the circuit attorneys with reference to the same matter and she said she didn't remember. The court then sustained an objection and terminated the further extended cross-examination with reference to the matter. The court did not abuse its discretion in terminating the cross-examination on such a collateral and immaterial matter as to what point on Chamberlain the witness had met the deceased. State v. Daniels, Mo.Sup., 347 S.W.2d 874, 878[4], 87 A.L.R.2d 1208. Counsel then asked a general question as to whether she gave

the circuit attorney's office a different statement from what she gave the police and an objection was again made and sustained. She had testified fully concerning her efforts to tell the police and one of the circuit attorneys the same facts regarding the place where she met the deceased on the evening in question.

Appellant contends that his purpose was to impeach to witness by showing that she had lied and made inconsistent statements involving the same transaction. No such proof was made and no foundation was laid for the impeachment of the witness and there is no suggestion that appellant was prejudiced by the court's rulings. See State v. Gilliam, Mo.Sup., 351 S.W.2d 723, 727 [9].

■ Defendant offered the testimony of certain witnesses to show that his reputation "for honesty and truthfulness and good moral character was good." After the witnesses had so testified, counsel for the State asked if they knew of defendant dating Mrs. Wheeler and they said that they did not, whereupon counsel asked: "If this man, a married man with six children, is going with a woman he is not married to, if you knew that, would you say his reputation for good moral character is good?" The witness answered, "No." Appellant contends that the court erred in permitting this attempt to show bad character by one specific instance and insists that bad character cannot be shown in that manner. Appellant cites State v. Kain, supra, 330 S.W.2d 842, 846[7]. The case has no application here since counsel for the State was entitled to cross-examine the three character witnesses concerning their testimony that appellant's reputation for honesty, truthfulness and good moral character was good. The State could properly and in good faith make inquiries of the defendant's character witnesses to test the extent of their knowledge of facts forming the basis of their opinions as to defendant's good character, as well as to

test the credibility of their opinions, and inquiries could be made concerning rumors even though the questions may have imputed pertinent acts or offenses to the defendant. State v. Havens, Mo.Sup., 177 S.W.2d 625, 629[12, 13]; State v. Livers, Mo.Sup., 340 S.W.2d 21, 26[6]. Further, the cross-examination could not have prejudiced appellant in the eyes of the jury, since he freely admitted his relationship to Mrs. Wheeler. He testified that he had seen her on numerous occasions; that, when he had threatened to break off with her, she had said she wouldn't stand for it; and that if he did break off with her she would tell his wife about his relationship with her. In his opening statement to the jury, defendant's counsel stated that defendant had met Mrs. Wheeler some four years ago; that the association between them had grown and continued for a long period of time; and that he had taken her to work the morning of the day in question and at that time everything between the two of them was all right.

■ Appellant further contends that the prosecuting attorney was guilty of misconduct in making reference to the fact that the defendant's wife was present in the courtroom at a particular time. The record shows that counsel for the State asked one of the defendant's character witnesses if he wasn't sitting in the courtroom with defendant's wife "all yesterday." An objection that the matter was irrelevant and immaterial was overruled and the witness answered, "Yes," that he was. Appellant says that this evidence was outside the record and was only done to bias and prejudice the jury against him. The question and answer made the matter a part of the record and the question was not objected to on the ground that it was done to bias and prejudice the jury against the defendant. Further, it appears that the question was asked in an effort to show the relationship of the witness to defendant's family or to indicate an interest

which might color his testimony in defendant's behalf. See State v. Miles, 199 Mo. 530, 98 S.W. 25, 28. The assignment is overruled.

Appellant further contends that the court, by its conduct in rushing defendant through cross-examination of the State's witnesses and by other orders and statements, unduly prejudiced the minds of the jury against defendant and coveyed the impression that the court was in favor of the conviction of defendant. In support of this assignment appellant refers to four or five rulings of the court during the course of the trial or during the argument. It is not necessary to review the rulings in detail. Clearly, they do not support appellant's contentions.

■ Appellant further contends that the prosecuting attorney was guilty of misconduct and the court erred in failing to reprimand the prosecuting attorney during the closing argument of defendant's counsel, when defendant's counsel commented on the fact the State had not shown the jury all the evidence "that they had in the evidence bag" and counsel for the State replied: "Go ahead, look at it, pull them right out." Appellant says that the conduct of State's counsel conveyed the impression "that the jury had a perfect right to inspect the bag of evidence when he well knew he had purposely withheld said evidence; and the court, on its own motion, should have reprimanded the State's counsel for such conduct." It will be noted that defendant's counsel had gone outside of the record to say that the State had not shown the jury all of the evidence and, having so gone outside the record and discussed matters not in evidence, he might well have expected retaliatory action on the part of State's counsel. In any event, there was nothing in the record to support appellant's conclusion as to what impression the action would have had on the jury. Further, no objection was made or relief asked at the time. The assignment is overruled.

Appellant's brief contains a number of other assignments of error under "Points and Authorities" but it will not be necessary to review them in detail in this opinion, which is already too long. It is sufficient to say that we have carefully examined each of these additional assignments and the record upon which they are based and the authorities, if any, cited in support of them and we find them to be without merit and they are overruled.

We have also examined the record with reference to those matters required to be reviewed under Supreme Court Rule 28.02 and no reversible error appears.

The judgment is affirmed.

All concur.