**STATE of Missouri, Respondent,**

v.

**John C. McCOY, Appellant.**

**No. 55004.**

Supreme Court of Missouri,
Division No. 1.

Oct. 12, 1970.

John C. Danforth, Atty. Gen., Dale L. Rollings, Asst. Atty. Gen., Jefferson City, for respondent.

Alfred I. Harris, St. Louis, for appellant.

HIGGINS, Commissioner.

John C. McCoy, with a prior conviction of burglary, second degree, was indicted for murder, second degree, of his wife, Hazel McCoy, and a jury convicted him of manslaughter. The court assessed his punishment at ten years' imprisonment and rendered judgment and sentence accordingly. §§ 556.280, 559.020, 559.070, 559.140, V.A.M.S.

On September 28, 1968, John C. McCoy and his wife, Hazel, lived in a four-room flat at 5945 Minerva, St. Louis, Missouri. Residing with them were John and Hazel's infant son and Hazel's children by former husbands, Bessie Lee Battle, Larry Battle, and Evelyn and Jimmie Wright.

Bessie was fifteen years of age when she testified at the trial. At about 7:30 to 8:00 p.m., Saturday, September 28, 1968, she was at home with her mother and all the children except Larry, who was visting his grandmother. Her stepfather, John C. McCoy, came home about 7:30 p.m., at which time she was in her bedroom. Her stepfather started beating her mother in the front room and she heard her mother "screaming and hollering." Her mother came into the bedroom, gave her a purse, and said she was going to her aunt's house. "Her hair was all over her head and she had been crying." She went back to the front room followed by Jimmie. Bessie remained in the bedroom and heard "something like it sounded like a firecracker." She went to the front room and saw her mother lying on the couch, breathing hard and unable to speak. Her stepfather was running around looking for his shoes and then made a telephone call. Later, the police came and took Mrs. McCoy to a hospital in an ambulance. The next time she saw her stepfather was at Koonce Funeral Parlor the following Monday. "He told us to remember that he was in the kitchen. * * * He said, 'Ya'll know I was in the kitchen cooking fish.'" No one cooked any fish the previous Saturday night.

Evelyn Wright was eleven years of age at the trial. She recalled that on the evening in question her stepfather "came home, then he slammed the door and pulled down the shades." He started hitting her mother and she heard her mother "hollering and screaming." She went to the bedroom when these events occurred rather than to help her mother "cause he told me * * * if we jump in something will happen to us." She saw her mother go to the bedroom and give Bessie her purse and return to the front room. "My brother followed her and then I heard a shot then." She ran to the living room and saw her mother lying on the couch. She also saw her stepfather at the funeral home and was told to tell "that he was in the kitchen frying fish." There was no fish frying in the kitchen.

Jimmie Wright, age twelve at trial, saw his stepfather come home on the night in question. "He closed the curtains * * * And then he jumped on my mother." He hit her with his fists and she was screaming. "She told him to leave her alone, and then he kept on, and then he started cursing. And then she got up and then he got up, and then he ran to the door and got the black cord off the door and started hitting her with it. * * * And then she was screaming, and then he snatched and threw her over his lap and then slapped something on her leg, and she screamed and got up and came back in the back room. * * * She told my sister to divide that money with me and my sister and give my uncle his money until she come back. And then she left and went back up in the front room." She was going "Over to my aunt's. * * * And I

followed her in there, and then she went in there and I came in there, and John was standing up with that gun in his hand and * * * it was a black gun." She was bending over, he had the gun in his hand, "I turned around to go back to the room. * * * And then I heard a shot, and I walked in and he was running back to the bed with his hand on the bed. * * * I seen him putting the gun under the bed, with his hand." Jimmie identified a black gun as looking "like the one he (John) had been carrying all the time." He, too, was admonished at the funeral home by his stepfather to tell that his stepfather had been in the kitchen cooking fish. Upon cross-examination Jimmie admitted that he did not tell this same story to the police at the time of investigation "because he was afraid" of John.

Patrolman William McNabb of the St. Louis Metropolitan Police Department was dispatched to the McCoy residence on September 28, 1968, arriving at approximately 8:49 p.m. He observed Mrs. McCoy lying on the couch with some blood on her chest. She didn't appear to be alive. John C. McCoy was sitting on the same couch with his head in his hands. "I asked him what had happened, and he just was shaking his head in his hands." He went to his patrol car and arranged for a conveyance to take Mrs. McCoy to the hospital. " * * * upon re-entering the living room I observed (McCoy) with his back turned slightly looking toward the side of the couch. And I observed his hands under some newspaper. I immediately went over to him and started to reach down, and he jerked his hand away from the newspaper. I removed the newspaper from the couch and found a revolver laying on the couch." Officer McNabb unloaded the revolver and put it and the empty shells in his pocket. At trial he identified the same revolver as that identified by Jimmie Wright, as well as the four live rounds and one spent cartridge which he removed from the revolver at the time of his investigation. He had given the revolver and bullets to Officer Boyd at the scene.

Sergeant Julian Boyd went to the McCoy residence and later to the city morgue where he viewed the body of Hazel McCoy. He noticed bruises about her face and a bullet entry wound on her chest and a bullet exit wound on her back.

Patrolman Robert Allen Boyd was also at the McCoy residence. He helped place Mrs. McCoy in the ambulance and accompanied her to the hospital where she was pronounced dead on arrival. He further accompanied the body to the city morgue where he recovered a spent slug from underneath her body. He gave the revolver and bullets given to him by. Patrolman McNabb and the spent slug to the police laboratory. He observed cut marks around the deceased's lips and bruises around the eyes, as well as the entrance wound on the left side of the chest of Mrs. McCoy and the exit wound in the left side of her back, just above the waist.

Detective Joseph Brasser, a ballistics expert, identified the gun previously identified by Jimmie Wright and Patrolman McNabb as a .38-caliber special Smith and Wesson. He test fired the revolver and determined that the spent slug recovered by Officer Boyd had been fired from this weapon.

Dr. James Criscione performed an autopsy on Mrs. McCoy's body and determined that she died of a gunshot wound of her heart and spleen.

Appellant's version of the facts is that on September 28, 1968, he came home from his work delivering for Straub's and found his wife not at home. He previously had seen her at a tavern with a friend, at which time he told her to leave the tavern and do her shopping. He went to search for her and found her at a tavern near their home; he told her to go home and followed her. When he got home he went to the bedroom where his wife was changing clothes, and an argument over her drinking ensued. He sat on the bed and removed his shoes. She grabbed him around the neck, "and I swung and hit her,

I don't know how many times I hit her, and she fell across the bed, started, I don't know, just hollering." He went to the kitchen to the icebox and she left their bedroom and slammed the door. "I heard something sounded like a shot * * * she was on the couch hanging off the couch with her head down. * * * I seen the gun there and I laid it on the couch there. * * * I called the police." He denied shooting his wife, ownership of the gun, and telling the children to say he had been in the kitchen frying fish.

Appellant also presented testimony of his employer, Frank Uhlenbrock, and of his former employer, Charles Isele, with respect to his reputation and character.

Appellant, by his Points A and B, contends that the court erred in failing to direct a verdict of acquittal, or to set aside the verdict, because the state failed to meet its burden of proving beyond a reasonable doubt that he killed his wife. His argument is that although a conviction can be sustained by circumstantial evidence, such evidence must be wholly consistent with the hypothesis of guilt and inconsistent and irreconcilable with innocence, State v. Sallee, Mo., 436 S.W.2d 246, 249–250[1]; State v. Worley, Mo., 353 S.W.2d 589, 594; and that the evidence showed that deceased committed suicide in the front room while he was in the kitchen cooking fish.

■ Appellant's argument credits only his own version of the facts and overlooks the proposition that in testing the sufficiency of the evidence, the court considers the evidence and all of its reasonable inferences from a standpoint favorable to the state and disregards the evidence and inferences to the contrary. State v. Holmes, Mo., 434 S.W.2d 555, 558[1]. So viewed, it is apparent from the statement of this case that the jury reasonably could have found that appellant killed his wife by shooting her with a revolver, and that such killing constituted the crime of manslaughter. State v. Kukovich, Mo., 380 S. W.2d 324, 326.

■ By Points C and D appellant contends that the court erred in allowing evidence of prior acts to impeach defendant's character and in failing to instruct the jury to disregard or limit consideration of such evidence. The argument is that the state, in its cross-examination of appellant's character witnesses, was permitted to ask of them with respect to prior specific criminal acts of appellant. He argues further that the state should have been limited to rebutting the character evidence by proof of general reputation and that, in any event, the use of any prior act should have been limited to acts direct in point to the character trait in issue.

Defendant's witnesses Uhlenbrock and Isele were asked on direct examination to state their opinion of defendant's reputation for quiet and peaceful manner, and each answered that it was good. The state, upon cross-examination, asked if their opinion would be the same if they were to consider former arrests or convictions for burglary, petty stealing, carrying concealed weapons, and robbery. Such questions were within the discretion accorded the trial court in its control of cross-examination. See State v. Wilson, Mo., 248 S.W.2d 857, 859[8], where the state was permitted to ask defendant's character witnesses if they had heard he had been arrested for other crimes; State v. Meller, Mo., 387 S.W.2d 515, 518[5], where the cross-examination concerned the effect upon defendant's reputation of previous convictions and recent charges for which defendant had not been tried; and State v. Curry, Mo., 372 S.W.2d 1, 8[9], where inquiries were permitted concerning rumors which might have imputed other pertinent acts or offenses to defendant.

" * * * there is a clear distinction * * * between offering evidence of specific acts of misconduct on the part of the defendant, and inquiring of his character witnesses on cross-examination whether they have heard rumors of specific acts of misconduct which would reflect upon his character. It is the rule * * * that

such an inquiry is permissible for the purpose of testing the knowledge of the witnesses, the trustworthiness and accuracy of their information, the basis for their judgment, their candor, and of course their credibility. * * * With this the purpose of the inquiry, there is no violation of the rule forbidding proof of particular acts of misconduct; * * *." State v. Carson, Mo., 239 S.W.2d 532, 536[5].

Since such cross-examination of defendant's character witnesses was proper, there was no reason for the court to give any limiting instruction.

In Point E appellant complains that a juror failed to truthfully respond to a question on voir dire; and in Point F he complains that the state used its peremptory challenges to exclude Negroes from the jury. He argues that his rights to a fair trial and to fair and impartial jurors were thus impaired and denied.

The transcript shows nothing with respect to either of these complaints and review is limited to proceedings shown by the properly authenticated transcript. The absence of any showing that the juror spoke untruthfully or that there was discrimination with respect to race representation on the jury precludes any finding of trial court error in the respects charged. State v. Overby, Mo., 432 S.W.2d 277, 279 [6–8].

Judgment affirmed.

HOUSER and WELBORN, CC., concur.

PER CURIAM:

The foregoing opinion by HIGGINS, C., is adopted as the opinion of the court.

All of the Judges concur.