**STATE of Missouri, Plaintiff–Respondent,**

v.

**Brian PHILLIPS, Defendant–Appellant.**

**Brian PHILLIPS, Movant–Appellant,**

v.

**STATE of Missouri, Respondent–Respondent.**

Nos. 63423, 67620.

Missouri Court of Appeals,
Eastern District,
Division Two.

Feb. 4, 1997.

Motion for Rehearing and/or Transfer to Supreme Court Denied March 20, 1997.

Application to Transfer Denied April 29, 1997.

Deborah B. Wafer, Dist. Defender, St. Louis, for movant–appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Mary Moulton Bryan, Asst. Atty. Gen., Jefferson City, Philip M. Koppe, Asst. Atty. Gen., Kansas City, for respondent.

DOWD, Judge.

Defendant appealed from a judgment entered upon his conviction by jury for second-degree murder, § 565.021, RSMo 1994, and for armed criminal action, § 571.015, RSMo 1994. The trial court found Defendant to be a prior, persistent, and Class X offender and sentenced him to twenty years' imprisonment for the murder conviction and to a three-year term of imprisonment for the armed criminal action conviction to be served consecutively. Defendant also appealed the denial of his Rule 29.15 motion after an evidentiary hearing. This court issued its original opinion on April 30, 1996, reversing and remanding the case for a new trial. The supreme court accepted the State's application for transfer and has retransferred the case to this court for reconsideration in light of its recent decision in *Johnson v. State*, 938 S.W.2d 264 (Mo. banc 1997). We again reverse and remand.

We summarize the evidence adduced at trial: Just before midnight on the evening of September 17, 1991, Hollie Dickerson met the victim Stanford Ussery and they visited a friend's house, drank beer and listened to music for approximately an hour. They then walked to a house on St. Louis Avenue to purchase drugs. Before going to the drug dealer's house, they stopped to talk with one of the drug dealer's neighbors, Myron Hagens, who is a long-time friend of Dickerson's. While victim waited on the front porch, Dickerson and Hagens talked in the

gangway between the two homes. As Dickerson and Hagens were returning to the front porch, a man brandishing a gun approached them. He demanded they leave immediately. Hagens retreated into his home. Dickerson escaped across the street after the gunman pointed the weapon at his head.

As Dickerson retreated, he heard the gunman tell victim to leave. Victim and gunman began talking. Two gunshots rang out, and Dickerson turned to see victim slump to the ground and the gunman flee. Victim was killed by a chest wound inflicted by the gunman.

Approximately two hours after victim was killed, Dickerson described the gunman to City of St. Louis homicide detectives; the attacker was a black male, light-complected, with a box-cut hairstyle wearing a red jacket with a black stripe. Dickerson told them he had never seen the man before.

Five days after the shooting, Hagens was interviewed by Detective Stevens. Hagens said the gunman was wearing a "white suit" and that his first name was Brian. Hagens also gave Detective Stevens Brian's address. Both Dickerson and Hagens identified Defendant as the gunman from a photo spread. Officers went to Defendant's home ten days after victim's death and arrested him. The officers searched the first floor of his home and seized a white jogging suit from the living room. Subsequently, both Dickerson and Hagens identified Defendant as the gunman from a live lineup. At trial, Dickerson and Hagens again identified Defendant as the gunman. No other evidence, physical or circumstantial, tied Defendant to the scene of the crime.

Defendant testified at trial. He denied shooting victim. Defendant claimed he was babysitting his daughter at his girlfriend's home until almost four in the morning on September 18, 1991.

■ We address first Defendant's third point on appeal since we find it requires us to reverse his judgment of conviction and remand the cause for a new trial. Defendant contends he was denied a fair trial because the trial court permitted the State to impeach his credibility with uncharged misconduct. We agree.

Defendant was on supervised release from federal imprisonment when victim was killed. One of the conditions of Defendant's early release required him to sign in and out of the federal halfway house where he was assigned. On the night of victim's death, Defendant left the federal halfway house without signing out. At the time of his arrest, Defendant spontaneously offered the following statement as the officers handcuffed him: "I was going to turn myself in for escaping custody because I had thought about it the night before."

■ Cross-examination of a witness to determine possible bias or interest is within the broad discretion of the trial court. *State v. Leisure,* 796 S.W.2d 875, 879 (Mo. banc 1990) (citing *State v. McNew,* 353 S.W.2d 571 (Mo.1962)). However, as a general rule, the credibility of a person testifying may not be impeached by showing "a mere arrest, investigation, or criminal charge which has not resulted in a conviction." *State v. Wise,* 879 S.W.2d 494, 510 (Mo. banc 1994) (quoting *State v. Sanders,* 360 S.W.2d 722, 725 (Mo. 1962)).[1] This rule is premised on the principles that such evidence is usually inadmissible hearsay, violative of the rule forbidding extrinsic evidence of misconduct, and has no logical tendency to prove the person has engaged in any criminal activity, or to impair the credibility of his testimony. See *State v. Williams,* 492 S.W.2d 1, 4 (Mo.App.1973); *Holden v. Berberich,* 351 Mo. 995, 174 S.W.2d 791, 792 (1943); *Coyne v. United States,* 246 F. 120, 121 (5th Cir.1917).

■ Exceptions to this general rule include: (1) where the witness may have an interest in testifying for the state;[2] (2)

---

1. The trial court, of course, must also balance the probative value of the offered evidence versus its possible prejudice on the defendant.

2. Examples include situations when an accomplice testifies in exchange for immunity from criminal prosecution (see *State v. Steele,* 226 Mo. 583, 126 S.W. 406, 412 (1910); *State v. Rose,* 339 Mo. 317, 96 S.W.2d 498, 504 (1936); *Holden,* 174 S.W.2d at 793; *Sanders,* 360 S.W.2d at 725; *State v. Watts,* 813 S.W.2d 940, 943 (Mo.App.

where the witness may have an interest in testifying for the defense;[3] and (3) where the witness, including a defendant in a criminal prosecution, has "opened the door" by making his/her character an issue. See *State v. Garrett,* 813 S.W.2d 879, 882 (Mo.App. 1991); *State v. Campbell,* 868 S.W.2d 537, 539 (Mo.App. E.D.1993).

After a lengthy sidebar concerning the admissibility of the statement, the court said, "I am going to allow her to question him with regard to the spontaneous statement only, what he said to the police officers when they approached." Defense counsel reiterated her objection:

> Your Honor, I would object as to that specific statement because it is evidence of crimes not charged. It is irrelevant. It is more prejudicial than it is probative and there is no reason for it to be admitted.... My client is on trial for murder[,] ... not [for] statements on other charges that never even came about.

The court, however, allowed the cross-examination by ruling as follows:

> Okay. Any spontaneous statement made by this Defendant at the time of this arrest will be admitted for purposes of showing what he said and the culpability he may have with regard to the charge of murder. That includes the spontaneous statement that he made.

We find admission of the statement violated the general rule against evidence of uncharged misconduct and did not fall within any of its exceptions; therefore, the trial court abused its discretion by allowing the State to question Defendant about said statement.[4]

The statement admitted indicated Defendant "escaped custody." A reasonable juror could infer such an act is not legally permissible and represents uncharged criminal misconduct. If true, such misconduct, which is a separate criminal offense, could have warranted a possible revocation of his supervised release and a resentencing. See, 18 U.S.C. § 3565(a)(2) (1990). We find the statement admitted invokes the rules prohibiting the admission of uncharged misconduct to impeach credibility.

■ Nor do we find any of the exceptions applicable. At trial, the State argued Defendant "opened the door" to the issue of his character.[5] However, the only evidence offered by Defendant relating to his character was his recitation of his prior convictions. The mere mentioning of prior convictions, as a matter of law, does not open up questioning regarding character. *Campbell,* 868 S.W.2d at 539. Additionally, the court's reliance on the spontaneity of the statement, and thus its exclusion from the hearsay rule, does not circumvent the principles upon which the rule against use of uncharged misconduct evidence rests.

■ We will only reverse a conviction if the admission of such evidence so prejudiced Defendant that he was denied a fair trial. *State v. Isa,* 850 S.W.2d 876, 895 (Mo. banc 1993) (citing *State v. Fulkerson,* 331 S.W.2d 565, 571 (Mo.1960)). The burden is on Defendant to show prejudice before reversal is required. *Leisure,* 796 S.W.2d at 879.

Defendant asserts he was prejudiced by the admission of the "escape" statement for two reasons: (1) the State did not produce

---

1991)), situations when a witness' testimony is possibly driven by a desire to have the state not prosecute him or her by reason of their testimony (see *State v. Ritter,* 288 Mo. 381, 231 S.W. 606, 607–08 (1921); *State v. Lockhart,* 507 S.W.2d 395, 397 (Mo.1974); *Wise,* 879 S.W.2d at 510), and situations where the witness expects favorable treatment or leniency if he furthers the state's case (see *Holden,* 174 S.W.2d at 793; *State v. Williams,* 492 S.W.2d 1, 6 (Mo.App. 1973); *State v. Joiner,* 823 S.W.2d 50, 54 (Mo. App.1991)).

**3.** An example of the second class of exceptions would be when two persons are indicted for the

same crime and one testifies falsely in support of the other to secure his own freedom (see *Holden,* 174 S.W.2d at 793; *State v. Taylor,* 498 S.W.2d 614, 618 (Mo.App.1973)).

**4.** We do not analyze this question under the hearsay rule since resolution of this point turns on whether evidence of uncharged misconduct was improperly admitted.

**5.** On appeal, the State did not address whether the admission of such statement constituted an abuse of discretion, and chose instead to argue Defendant was not prejudiced by the statement's admission.

strong evidence of his guilt, and (2) the State's cross-examination and closing argument illustrate how pervasive and damaging the escape statement was on Defendant's credibility.

The heart of the State's case-in-chief rested on the testimony (and thus the credibility) of two eyewitnesses, Dickerson and Hagens. No physical evidence or other eyewitness testimony tied Defendant to the murder. The trial hinged on the trustworthiness of Dickerson and Hagens' eyewitness identification of Defendant and Defendant's alibi testimony.

The State used the "escaped custody" evidence in closing argument at four different times to attack Defendant's credibility. Among the references made, the State argued, "Ladies and Gentlemen, you have to judge who's got the motive to lie here: a four-time felon *on escape status* at the time this occurred? Hollie Dickerson ... or Myron Hagens...." (Emphasis added).

Additionally, the record reveals the testimony of Dickerson and Hagens contains numerous inconsistencies that cast doubt on the credibility of their testimony. For example, within three hours of the shooting, Dickerson, in a tape-recorded statement to homicide detectives, said the gunman was a light-skinned black male, had a box-style haircut, and was wearing a red jacket with a black stripe. At trial, he testified the gunman was wearing a white jogging suit and had a curl-type haircut.

At trial, Dickerson testified the gunman put the murder weapon to his head and told him to "get the 'F' outta here." Dickerson testified that while the gun was briefly put to his head, he looked at the man's jacket and face. However, on the night of the murder, Dickerson failed to mention the gun being placed to his head.

A few days later, Hagens told detectives the gunman was wearing a white suit with black stripes. Hagens also told the police the gunman was light-complected and had a box-style haircut. Hagens testified at trial that as soon as the gunman appeared, waiving the gun and telling everyone to leave the

area, he ran across the street into his house. Hagens further testified he told someone he didn't know who the gunman was because he couldn't give a good description of him.

The State asserts on appeal Defendant could not have been prejudiced "since evidence [Defendant] put before the court established essentially the same facts, i.e. that [Defendant] had prior convictions." We find such an argument unavailing. Defendant's testimony regarding his prior convictions in no way related to his alleged escape from the halfway house.

▮▮▮ Even though we have found the admission of Defendant's statement requires us to reverse and remand for a new trial, we will address Defendant's first, second, and fourth points on appeal since they may arise in a new trial. In his first point on appeal, Defendant asserts the trial court erred by entering a written sentence that materially differed from the oral pronouncement of sentence which did not state Defendant was being sentenced as prior, persistent, or Class X offender. In light of the supreme court's recent opinion, *Johnson v. State*, 938 S.W.2d 264 (Mo. banc 1997), we disagree. Although the trial court's formal oral pronouncement of sentence was silent on the issue of Defendant's status as a prior, persistent and Class X offender, it is clear from a review of the entire record that the trial court found him to be such. That being the case, the oral sentence was not materially different from the written one. Where the record shows that the oral sentence was not materially different from the written one, the rule requiring the oral pronouncement of sentence to be controlling has no application. *Johnson*, 938 S.W.2d at 264–65. We therefore find no error in the trial court's entry of the written sentence.

▮▮▮ In his second point on appeal, Defendant contends the trial court erred by overruling his *Batson*[6] objection challenging the State's use of a peremptory strike against venireperson Reese. An appellate court should uphold a trial court's decision under *Batson* unless it finds the decision clearly erroneous. *State v. Griffin*, 756

---

**6.** *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct.  1712, 90 L.Ed.2d 69 (1986).

S.W.2d 475, 482 (Mo. banc 1988), *cert. denied,* 490 U.S. 1113, 109 S.Ct. 3175, 104 L.Ed.2d 1036 (1989); see *State v. Antwine,* 743 S.W.2d 51, 66 (Mo. banc 1987). In the third and last step of the *Batson* analysis,[7] the chief consideration for the trial court is whether the prosecutor's reasoning, in light of the entire facts and circumstances of the case, constitutes purposeful discrimination. *State v. Parker,* 836 S.W.2d 930, 939 (Mo. banc 1992).

In the instant case, however, we cannot review the trial court's denial of Defendant's *Batson* motion because it failed to conduct the third step of the analysis; namely, whether the State's rationale for the strike was a pretext for purposeful discrimination. The trial court found the State had given a race-neutral reason for its strike of venireperson Reese; but rather than turn to Defendant and ask for its proof on the question of whether the race-neutral explanation was a pretext for purposeful discrimination, it denied Defendant's *Batson* motion as to venireperson Reese and *then* allowed Defendant to make a record of proof on the question of pretext. Although the State argues Defendant was given an opportunity to present his case, we are unpersuaded because Defendant's "opportunity" came after the trial court had denied the motion. Denying a *Batson* motion without allowing Defendant an opportunity to carry his burden of proving purposeful discrimination constitutes trial court error. See *Parker,* 836 S.W.2d at 939; *Antwine,* 743 S.W.2d at 63; *Purkett,* 514 U.S. at ——, 115 S.Ct. at 1771.

Next, Defendant contends the trial court erred in allowing the State to urge the jury to send a message to the community. This issue was disposed of in *State v. Plummer,* 860 S.W.2d 340, 350 (Mo.App. E.D.1993). Point denied. We need not address Defendant's last assertion of error regarding the motion court's findings and conclusions under Rule 29.15 because of our conclusion regarding point three.

---

7. In the first step, the defendant must challenge one or more specific members of the venire struck and identify the protected racial group to which the person belongs. In the second step, the trial court must require the state to offer clear and reasonable specific race-neutral expla-

Accordingly, this cause is reversed and remanded for a new trial consistent with this opinion.

CRAHAN, P.J., and CRANDALL, J., concur.

---

nations for the strike. In the last step, the defendant will need to show the state's proffered reasons for the strikes were a pretext for unlawful racial discrimination. *See Purkett v. Elem,* 514 U.S. 765, —— —— ——, 115 S.Ct. 1769, 1770–71, 131 L.Ed.2d 834 (1995).