STATE of Missouri, Respondent,

v.

Johnny A. JOHNSON, Appellant.

No. SC 86689.

Supreme Court of Missouri,
En Banc.

Nov. 7, 2006.

Rehearing Denied Dec. 19, 2006.

Deborah B. Wafer, Office of Public Defender, St. Louis, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Richard A. Starnes, Shaun J. Mackelprang, Deborah Daniels, Asst. Attys. Gen., Jefferson City, for Respondent.

WILLIAM RAY PRICE, JR., Judge.

A jury convicted Johnny Johnson of first-degree murder and recommended a sentence of death. The jury also convicted him of armed criminal action, kidnapping, and attempted forcible rape and recommended life sentences for these crimes. Judgment was entered consistent with the jury recommendations. Because Johnson was sentenced to death, this Court has exclusive jurisdiction of his appeal. Mo. Const. art. V, sec. 3. The judgment is affirmed.

## I. Facts

Johnny Johnson's convictions resulted from the murder of six-year old Casey Williamson on July 26, 2002.[1] Casey lived with her mother, Angie, and her siblings at her grandfather's home on Benton Street in Valley Park. Casey's parents were separated and her father, Ernie, lived across the street, in the home of Michelle Rehm and her boyfriend Eddy, so that he could remain close to his children.

Two days before Casey's murder, on July 24, 2002, Johnson went to Michelle's house to look for Eddy and Ernie. That same day, he was seen by Casey's sister, Chelsea, and her friend, Angel, when they were riding bikes on Benton Street. Chelsea and her friend noticed that Johnson was following them and sped up as they returned home.

On the night of July 24, 2002, Angie took the children to Michelle's house to spend the night with Ernie. Johnson also stayed at Michelle's house that evening.

The next morning, July 25, 2002, Angie awoke to find Casey on the couch watching cartoons with Johnson. Johnson told Angie that Casey was not bothering him. Unbeknownst to anyone at the time, however, Johnson had begun to think Casey was "cute" and had "ideas" of wanting to have sex with her.

That day, Angie took the children back to her father's house for the day. At one point during the day, Casey, her sister, and other friends, including Angel, were at the home by themselves. Angel noticed Johnson sitting on a chair by the deck and locked the door. Angel later heard knocking, but did not answer the door.

On the evening of July 25, 2002, Johnson joined in a barbeque at Michelle's house. That evening, Casey and her siblings again spent the night with their father at Michelle's house.

The next morning, July 26, 2002, Ernie awoke around 6:00 a.m. to prepare for work. Casey awoke and said she was hungry. Ernie told her that he would take her to her grandfather's house to get breakfast and told her to wait upstairs while he went downstairs to get ready for work. Downstairs, he noticed Johnson asleep on the couch.

Casey did not stay upstairs. Johnson awoke to find Casey standing near the couch watching television and sensed this was his best opportunity to have sex with her. He had decided that to avoid being caught for sexually assaulting her, he would kill her after having sex with her. Johnson asked Casey if she wanted to go to the glass factory[2] to play games and have fun. Casey said she would go with him and they left. Casey was wearing only her nightgown and underwear. As they walked down Benton Street and into an alley, Casey complained her feet hurt and Johnson picked her up and carried her. When they came to the woods leading to the glass factory, they walked along one of the paths to a sunken pit with brick and concrete walls more than 6 feet high. Casey and Johnson crawled through a small tunnel and dropped into the pit.

Johnson asked Casey if she wanted to see his penis. She said no, but he pulled down his shorts and exposed himself. Casey turned her head away. Johnson then asked Casey to pull down her panties so he could see her vagina. She said no, and Johnson grabbed her underwear, tore it

---

**1.** This Court reviews the facts in the light most favorable to the verdict. *State v. Christeson*, 50 S.W.3d 251, 257 (Mo. banc 2001).

**2.** The glass factory, a popular hangout for neighborhood kids, refers to an abandoned factory surrounded by wooded areas and a series of trails.

off her, and forced her to the ground. Pinning her to the ground with his chest, Johnson attempted to achieve an erection by rubbing his penis on Casey's leg. Casey started screaming, kicking, and pushing at Johnson, scratching his chest.

Even though he had not yet raped Casey, Johnson got up and decided to kill her. He grabbed a brick and hit Casey in the head with it at least six times, causing bleeding and bruising. She was not yet dead or knocked unconscious and started to run around the pit. Johnson hit her with the brick again. She fell to her knees and tried to crawl away from Johnson. He struck her with the brick again, eventually knocking her to the ground and fracturing the right side of her skull. Because she was still moving, Johnson then lifted a basketball-sized boulder and brought it down on the back left side of Casey's head and neck, causing multiple skull fractures. Casey inhaled and exhaled "really fast" and then stopped breathing.

Johnson wiped blood from Casey's face with her underpants and then threw them in an opening in the wall. He buried Casey with rocks, leaves, and debris from the pit. He then went to the nearby Meramec River to wash Casey's blood and other evidence from his body.

The police were looking for Johnson. Officer Chad Lewis met up with him. He had Johnson get in a police car to talk because there were so many people in the area. Without any question being asked, Johnson said he would not hurt "little kids" and that he liked them because he had one of his own. He explained to Officer Louis that he had gone for a swim in the river and explained his route there. Officer Louis thought Johnson's route was unusual because most locals would have cut through the glass factory to get to the river. He asked Johnson if he had been in the glass factory, which Johnson denied.

At Officer Louis's request, Johnson agreed to go to the police station to talk in private.

While at the station, Johnson was identified by a witness who had seen him carrying Casey that morning. Around 8:30 a.m., Detectives Neske and Knieb arrived at the station and took Johnson to a police substation that had an open interview room. On the ride to the substation, Johnson was informed of his rights and indicated he understood them. At the substation, around 9:25 a.m., Johnson signed a waiver form after again being advised of his rights. Johnson said he wanted to make a statement. For about an hour, Johnson and Detective Neske conversed, and Johnson denied seeing or being with Casey that morning. Even when confronted with accounts of witnesses seeing him with Casey that morning, Johnson continued his denials.

When Detective Neske brought up a hypothetical about Johnson's son being missing, Johnson became angry. Johnson said he was being treated for schizophrenia and had been hospitalized for it in the past. Johnson denied that he was hearing voices and said he usually only saw shadows, but he denied having any hallucinations at that time. Johnson said he had not taken any medication for a month and was not suffering from it anymore.

The detectives took a break from talking with Johnson and brought him food. In the early afternoon, about 1:30 p.m., Johnson agreed to submit to a rape kit. Before the samples were collected, Detective Neske told Johnson that they would determine his involvement and said he needed "to be a man and tell me where she's at." Johnson started crying and said, "She's in the old glass factory."

When asked if Casey was alive, Johnson said she was dead and it was an accident.

He said that Casey wanted to go to the glass factory with him and that a rock had fallen from the pit wall when he was climbing it and hit Casey's head, killing her. Johnson said he then "freaked out," thinking he would not be believed, and buried Casey. He said he went to the river to kill himself, but could not. Johnson drew two maps to help officers find Casey's body, but officers at the scene were unable to find the body and Johnson was taken there.

Before Johnson arrived, however, a private citizen who had joined the search for Casey that morning came upon the tunnel leading to the pit where Johnson had taken Casey. In the middle of the pit, he saw a pile of rocks, blood around the pile, and Casey's foot between the rocks. He saw "a piece of concrete that probably weighed a hundred pounds" where Casey's head would have been. Police arrived and secured the pit.

Johnson was taken to police headquarters. Detective Neske observed the pit and spoke with an officer who was processing evidence at the scene. The evidence officer told Detective Neske that there was no place to climb out of the pit and said there was blood all over the floor of the pit, which contradicted Johnson's story.

Detective Neske went to police headquarters to talk with Johnson. He again advised Johnson of his rights and the waivers, and said he had been to the scene and did not think it was an accident. Johnson then told Detective Neske that once he and Casey were in the pit he had asked Casey if she wanted to see his penis and pulled down his pants. Johnson said that he asked Casey to show him her vagina and pulled off her underwear, which caused her to start "freaking out" and saying she would tell her parents. Johnson said this caused him to start "freaking out" as well, and he picked up the brick and hit her a couple of times in the head, then dropped the "boulder" on her head. He said he wanted her to expose herself so he could masturbate. He said he wiped blood from Casey's face with the underwear, discarded it, buried the body, and went to the river to wash off the blood. Around 8:30 p.m., Johnson repeated this version of events in an audiotaped statement. In these statements, Johnson did not admit that he intended to take Casey, rape her, or kill her prior to entering the pit.

Later that night, around 11:30 p.m., Detective John Newsham was instructed to take Johnson to the county jail. While Johnson was awaiting booking, Detective Newsham began discussing reading with him. Johnson said he liked to read the Bible and was concerned about his "eternal salvation." He said he was "fine," and that he "felt he was going to receive the death penalty and that he wanted to be executed." He asked Detective Newsham, "[D]o you think I'll ever achieve eternal salvation[?]" Detective Newsham thought that Johnson was indicating he had not been completely honest earlier and he took this as an opportunity to get more information. He told Johnson that to be forgiven for this crime he had to be completely truthful and honest and not leave out details. Johnson admitted he had not been completely honest. Johnson was returned to police headquarters, again waived his rights, and made verbal and audiotaped statements. In these statements, he admitted that he intended to take Casey for the purpose of having sex with her and planned to kill her after doing so.

An autopsy showed that Casey died from blunt force injuries to her head, which caused skull fractures and bruising of her scalp and brain. She also suffered injuries to her arms, shoulders, legs, and back. Her blood was found on Johnson's

shirt and a brick and large rock recovered from the pit. Johnson's semen was found on his shorts.

At trial, Johnson did not deny killing Casey, but disputed that he deliberated before doing so. His diminished capacity defense asserted that he could not deliberate due to mental illness, specifically schizo-affective disorder that caused command hallucinations to rape and kill Casey. In rebuttal, the State's expert testified that Johnson was capable of deliberation and any hallucinations that he may have had at the time were due to methamphetamine intoxication, not psychosis.

The jury found Johnson guilty of all offenses. In the penalty phase, the jury recommended a sentence of death for murder, finding all three statutory aggravators submitted. Johnson was sentenced to death for murder and as a persistent offender to consecutive life sentences for the other charged crimes.

## II. Standards of Review

 The evidence is reviewed in the light most favorable to the verdict. *State v. Strong*, 142 S.W.3d 702, 710 (Mo. banc 2004). This Court's direct appeal review is for prejudice, not mere error, and the trial court's decision will be reversed only if the error was so prejudicial that it deprived the defendant of a fair trial. *Id.* Trial court error is not prejudicial unless there is a reasonable probability that the trial court's error affected the outcome of the trial. *State v. Zink*, 181 S.W.3d 66, 73 (Mo. banc 2005). Any issue that was not preserved can only be reviewed for plain error, which requires a finding that manifest injustice or miscarriage of justice has resulted from the trial court error. *State*

*v. Glass*, 136 S.W.3d 496, 507 (Mo. banc 2004).

## III. Issues on Appeal

Johnson raises 10 points of error: (1) the trial court erred in overruling his *Batson* challenges to the State's peremptory strikes of an African–American male juror and an Asian female juror; (2) the trial court erred in precluding defense counsel from asking prospective jurors whether, knowing that first-degree murder is a coolly-reflected-upon, deliberated killing, they could consider a sentence of life imprisonment without probation or parole; (3) the trial court erred in allowing the state to elicit evidence of uncharged crimes of "stalking" children in the days preceding Casey's murder over his objections; (4) the trial court erred in submitting a voluntary intoxication instruction, Instruction 6, over his objections; (5) the trial court erred in overruling his motion to suppress statements he made to Detective Newsham; (6) the trial court erred in overruling his objections and submitting Instruction 23, the statutory aggravator that the murder "was outrageously or wantonly vile"; (7) the trial court erred in overruling his new trial motion and sentencing him to death;[3] (8) the trial court erred in overruling his objections to Instructions 24 and 26 because they did not properly instruct the jury about how to weigh the mitigating and aggravating factors presented; (9) the trial court erred in overruling his motion to quash the information or, alternatively, preclude the death penalty and death sentence; and (10) the trial court plainly erred in failing to admonish the prosecutor and give a corrective instruction when he stated in guilt phase closing argument that

**3.** Johnson's Point VII is addressed last below because it invokes this Court's proportionality review under section 565.035, RSMo 2000.

All further statutory references are to RSMo 2000, unless otherwise indicated.

the jury should "for once" hold Johnson responsible.

## A. *Batson* Challenges

Johnson alleges that the trial court erred in overruling his *Batson*[4] challenges to the State's peremptory strikes of an African–American male juror, Murphy, and an Asian female juror, Gilbert. In addition to arguing that the State's race-neutral reasons for striking Murphy and Gilbert were pretextual, Johnson also asserts that the court wrongly denied him the opportunity to show pretext.

### 1. *Batson* Standards

■ Parties cannot exercise peremptory challenges to remove potential jurors solely based on the jurors' gender, ethnicity, or race. *Strong*, 142 S.W.3d at 712. In raising a race-based *Batson* challenge, three steps are followed: (1) the defendant raises a *Batson* challenge with respect to a specific venireperson struck by the State, identifying the cognizable racial group to which that person belongs; (2) the State must supply a reasonably specific and clear race-neutral reason for the challenged strike; and (3) if the state provides an acceptable reason for the strike, then the defendant must show that the State's given reason or reasons were merely pretextual and that the strike was racially motivated. *Id.*

■ In determining pretext, the main consideration is the plausibility of the prosecutor's explanations in light of the totality of the facts and circumstances surrounding the case. *State v. Edwards*, 116 S.W.3d 511, 527 (Mo. banc 2003). The court also considers the presence of similarly situated white jurors who were not struck. *Strong*, 142 S.W.3d at 712. "Evidence of purposeful discrimination is established when the stated reason for striking [a minority] venireperson applies to an otherwise-similar member of another race who is permitted to serve." *State v. McFadden*, 191 S.W.3d 648, 651 (Mo. banc 2006). Other factors the court considers include the logical relevance between the State's proffered explanation and the case to be tried, the prosecutor's credibility based on his or her demeanor or statements during voir dire and the court's past experiences with the prosecutor, and the demeanor of the excluded venireperson. *Strong*, 142 S.W.3d at 712. Finally, the court can consider objective factors bearing on the State's motive to discriminate on the basis of race, such as conditions prevailing in the community and the race of the defendant, the victim, and the material witnesses.[5] *Edwards*, 116 S.W.3d at 527.

■ This Court defers to the trial court in these matters, and will overturn its decision only upon a showing of clear error. *State v. Morrow*, 968 S.W.2d 100,

---

**4.** *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

**5.** Consideration of this factor is not raised in the parties' arguments, but the prosecutor's comments during his peremptory strikes addressed this concern insofar as he stated:

"[I]n this particular case ... every witness, including the victim in this case, is white and there are no—I can't even think of any African–American witnesses that may be called in this particular case and so I don't think the basis for any suggestion that

somehow race could in any way, shape or form impact a decision in the case. In addition, it should be noted for the record that there a number of black jurors that we—that are on the jury, both male and female. I think they would—would be good jurors for the State's case."

In response to these comments, defense counsel noted that she planned to call one African–American witness that the prosecutor did not know about.

113 (Mo. banc 1998). A clear error is one that leaves this Court with a definite and firm conviction that a mistake has been committed. *Id.*

## 2. Challenged Strikes

Johnson maintains that the State's strikes of venirepersons Murphy and Gilbert were pretextual. He also complains that the trial court erred in denying his *Batson* challenges before giving him a chance to demonstrate pretext.

The following exchange took place after the prosecutor's peremptory strikes:

[Defense Counsel]: We'll make a *Batson* motion as to two jurors. The first one is ... [Murphy], who is an African–American male. We would ask the State to state their reason for that strike.

. . . .

[Prosecutor]: Regarding [Murphy] ... he is single, not married, with no children. As we know this case involves the death of a very young child and so I looked for jurors, among other things, who have children. He's also a youth specialist so he has some contact with kids working for the Division of Young Services for a number of years, if not an actual social worker or towards social work, works with troubled kids. My concern, he might see himself in the position to save the defendant or could identify with one of the kids he works with and treats for the past three years.

[Court]: I think that's a viable reason to deny the *Batson* challenge.

[Defense Counsel]: The other one is to both gender and race as to ... Gilbert, who appears to be an Asian female.

. . . .

[Prosecutor]: Also Mrs. Gilbert, though a married woman, indicates she has no minor children. She is a student, she lists her occupation as a student, and I'm trying to figure out how to be polite, she doesn't look to be the typical student age range, which leads me to believe she may be a professional student. Students tend not to have the sort of life experiences I think would be important life experiences you would have with kids and life experiences being something other than a student.

[Court]: All right. I'll overrule the *Batson* challenge.

[Defense Counsel]: If you could make a record, the State indicated the State struck the juror because she didn't have children? Did you say that was the reason for Gilbert?

[Prosecutor]: Yeah, one of the reasons. There's no single reason for anybody, but that's mainly one of the considerations in both selecting and striking jurors with minor children.

[Defense Counsel]: Juror ... Travers, white male, also has no children. The State did not use any peremptory challenges for him. Also, juror ... Maloney, whi[t]e male, who has no children, the State did not exercise any challenges for him.

[Prosecutor]: Both Travers and Maloney, the reasons I struck the others, it's not just for people with children, that's not the sole consideration. They also had responses, at least by mannerism, certainly would appear to be favoring the State's position.

[Defense Counsel]: I'm pointing out those jurors that are similarly situated, they don't have children. I think that's part of the record we need to make.

[Prosecutor]: They are not just students, they don't work for the Division of Youth Services. While they didn't have children, they also don't have some of the other matters that I thought were important in consideration of striking the others."

The discussion of the strikes of Murphy and Gilbert then ended without any further comment from the trial court.

### 3. Pretext

■ Johnson fails to show that the State's reasons for striking venirepersons Murphy and Gilbert were pretextual and that the strikes were racially motivated. The State used each of its peremptory strikes to strike venirepersons without minor children, including white venirepersons who did not have children. "[I]t is well-recognized that an important factor in determining whether the defendant has proved purposeful discrimination is whether the State used peremptory challenges to remove similarly situated Caucasian venirepersons." *State v. Ashley,* 940 S.W.2d 927, 932 (Mo.App.1997). Johnson cannot demonstrate pretext in the prosecutor's claim that one of his reasons for striking Murphy and Gilbert was their lack of minor children given that the State's challenges were exhausted removing minorless venirepersons, while minority venirepersons remained on the jury panel. *See State v. Shurn,* 866 S.W.2d 447, 456 (Mo. banc 1993) ("[T]he prosecutor's failure to use all his challenges against blacks is relevant to show that race was not the motive for the use of peremptory strikes.").

Given the facts of the case, it was logical for the State to want jurors who had minor children. Johnson's counsel recognized the prosecutor's logic in striking minorless venirepersons when she explained that she had struck a female venireperson for reasons that included: "She has children. Just as the State indicated they were interested in finding jurors with children, we believe jurors with children might be a detriment to us because of the nature of the charge."

■ Johnson also fails to show there was pretext in the State's reasons for striking Murphy and Gilbert based on their occupations. "Employment is a valid race-neutral basis for striking a prospective juror." *State v. Williams,* 97 S.W.3d 462, 472 (Mo. banc 2003). It was logical for the prosecutor to believe that Murphy's work with the Division of Youth Services might make him more sympathetic to Johnson. Similarly, the prosecutor was concerned that Gilbert's occupation as a student caused her to lack sufficient life experiences he would prefer in jurors. The prosecutor's preference for jurors with life experience was demonstrated by his use of peremptory strikes against venirepersons Schafer and Johnson, who had worked at their jobs less than a year, and venireperson Milan, who was unemployed. Each of the jurors who served on the jury was employed for five or more years.

Johnson argues that the prosecutor's failure to ask questions during voir dire relating to his reasons for striking Murphy and Gilbert undermines the plausibility of his explanations. He asserts that if the issues of children or occupations truly mattered, the prosecutor would have inquired about those subjects on voir dire, rather than relying on juror questionnaire responses. In support of this proposition, Johnson cites *Miller–El v. Dretke,* wherein the United States Supreme Court found pretext where a prosecutor's purported reasons for striking a prospective juror were "makeweight" and "reek[ed] of afterthought" and the prosecutor had not inquired into the subject during voir dire, suggesting it did not "actually [matter]." 545 U.S. 231, 125 S.Ct. 2317, 2328, 162 L.Ed.2d 196 (2005) (citing *Ex parte Travis,* 776 So.2d 874, 881 (Ala.2000) ("[T]he State's failure to engage in any meaningful voir dire examination on a subject the State alleges it is concerned about is evidence suggesting that the explanation is a

sham and a pretext for discrimination")). Unlike in *Miller–El*, however, the prosecutor's reasoning in this case was not "make-weight" or "reeking of afterthought."

Johnson criticizes the prosecutor's failure to ask Murphy and Gilbert voir dire questions that would have illuminated their past experiences with children, but he does not allege that the prosecutor made similar inquires to other venirepersons listed as without children on the questionnaires. The prosecutor's reliance on the questionnaire information was warranted because sufficient information was available from the questionnaires to support his reasoning for striking Murphy, Gilbert, and the other venirepersons without children who were struck.[6]

### 4. *Batson* Procedure

Johnson further argues that the trial court erred in deciding his *Batson* challenges because it denied him an opportunity to carry his burden of showing purposeful discrimination. The trial court denied the *Batson* challenges as to Murphy and Gilbert immediately after the prosecutor explained his reasons for the strikes. Johnson contends that, in doing so, the trial court failed to consider *Batson's* third stage—whether or not the prosecutor's reasoning was pretextual.

Johnson's argument relies on *State v. Phillips*, 941 S.W.2d 599, 604 (Mo.App. 1997), wherein the Eastern District opined that denying a defendant a chance to show purposeful discrimination before denying a

*Batson* challenge constituted trial court error. The *Phillips* court rejected the State's argument that giving the defendant an opportunity to make a record after the court's ruling was sufficient. 941 S.W.2d at 604. *Phillips*, however, offers limited guidance in this case because its discussion of the trial court's premature ruling on the defendant's *Batson* challenge followed the reversal of the defendant's conviction on another ground and the court did not explore the impact of the trial court's error in ruling on the *Batson* challenge. In short, the language relied on by Johnson is dicta.

Johnson argues that the trial court's premature rulings on his *Batson* challenges constituted structural error requiring reversal and remand because it involves jury selection. "Structural defects" are constitutional errors that "defy analysis by 'harmless-error' standards" because they "affec[t] the framework within which the trial proceeds, [and are not] simply [errors] in the trial process itself."[7] *Arizona v. Fulminante*, 499 U.S. 279, 309–10, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991).

The State, however, maintains that any error in ruling prematurely was merely a procedural error, not a structural error, and should be reviewed for prejudice. It argues that Johnson was not prejudiced because each step required under *Batson* was fulfilled insofar as Johnson was given an opportunity to make arguments as to pretext after the trial court's initial denial

---

6. Johnson suggests that reliance on juror questionnaires is disfavored, but in *Knese v. State*, 85 S.W.3d 628, 633 (Mo. banc 2002), this Court found counsel was ineffective for failing to read juror questionnaires. Counsel's ability to inquire during voir dire does not destroy the usefulness of juror questionnaire responses.

7. The other class of constitutional errors, which includes most constitutional errors, is termed "trial errors" because the errors "[occur] during presentation of the case to the jury, and ... may therefore be quantitatively assessed in the context of other evidence presented in order to determine whether [they were] harmless beyond a reasonable doubt." *Arizona v. Fulminante*, 499 U.S. 279, 307–08, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991).

and, as such, the trial court considered the issue of pretext.

Johnson complains that the trial court too quickly ruled on his *Batson* challenges, but he does not argue that the trial court applied an improper standard in deciding the issue [8] or that it prevented him from exercising his peremptory challenges.[9] The trial court's premature ruling did not prevent it from considering Johnson's arguments as to pretext. After the trial court denied the *Batson* challenge as to Murphy, defense counsel immediately raised her challenge as to Gilbert, without complaining that she was not allowed to demonstrate prextext before the court's ruling. After the Gilbert challenge was also denied, defense counsel then immediately began an inquiry suggesting why the prosecutor's reasons for striking Murphy and Gilbert were pretextual.

■■■ The primary consideration in examining a procedural *Batson* challenge is whether the defendant had a full and fair opportunity to set out his or her arguments and to make a complete record for review. While the three-step process required by *Batson* was not followed in order, no step of the process was omitted. Because Johnson was afforded consideration of each step of the *Batson* process, he was not prejudiced by the trial court's

failure to follow the steps in a precise order. Neither was he denied the opportunity to make of record of his evidence or arguments. Under these circumstances, the court's premature ruling resembles an error of process, not a structural defect that impacted the framework of Johnson's trial.[10] Because Johnson cannot show that he was prejudiced by the trial court's premature *Batson* ruling, he is not entitled to relief on this issue.

The trial court did not err in overruling Johnson's *Batson* challenges and permitting the prosecutor's peremptory strikes of Murphy and Gilbert.

## B. Restriction of Voir Dire Questioning

Johnson argues that the trial court erred by not allowing defense counsel's questions during voir dire that asked venirepersons whether, knowing that first-degree murder is a coolly-reflected-upon, deliberated killing, they could consider a sentence of life imprisonment without probation or parole. He asserts that the trial court's ruling prevented defense counsel from knowing venirepersons' views on the issue of punishment for first-degree murder, thereby hindering determination of who would be a suitable juror and denying him effective assistance of counsel.

---

**8.** Courts have found error where consideration of *Batson's* second and third steps was combined and imposed an improper burden of persuasion. *See Purkett v. Elem*, 514 U.S. 765, 768, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995); *U.S. v. McFerron*, 163 F.3d 952, 954–56 (6th Cir.1998).

**9.** Denial or impairment of the right to peremptory challenges has been considered a structural defect that is not reviewed for prejudice. See, e.g., *Moran v. Clarke*, 443 F.3d 646, 660–61 (8th Cir.2006); *U.S. v. Annigoni*, 96 F.3d 1132, 1143 (9th Cir. en banc 1996); *U.S. v. Broussard*, 987 F.2d 215, 221 (5th Cir.1993), *abrogated on other grounds by*

*J.E.B. v. Alabama*, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994); *Olympia Hotels Corp. v. Johnson Wax Dev. Corp.*, 908 F.2d 1363, 1369 (7th Cir.1990).

**10.** Even if Johnson's defense counsel had failed to present her arguments as to pretext, this Court would be unlikely to find "structural error" under these circumstances. Where the trial court too quickly rules on a *Batson* challenge, defense counsel should interject and make her arguments as to pretext—as defense counsel did here. Counsel should not be allowed to create reversible error simply by ignoring a judge's failure to consider a particular *Batson* step.

### 1. Standards for Review

A defendant is entitled to a fair and impartial jury. U.S. Const. amends. VI, XIV; Mo. Const. art. I, sec. 18(a). A necessary component of the guarantee for an impartial jury is an adequate *voir dire* that identifies unqualified jurors. *Morgan v. Illinois*, 504 U.S. 719, 729–30, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992) (adequate voir dire needed for trial judge to fulfill responsibility to remove prospective jurors who are unable to impartially follow the court's instructions and evaluate the evidence). The trial judge is given wide discretion in conducting voir dire and determining the appropriateness of specific voir dire questions. *State v. Oates*, 12 S.W.3d 307, 310 (Mo. banc 2000).

The trial court's voir dire ruling will be reversed only where an abuse of discretion is found and the defendant can demonstrate prejudice. *Id.* at 311. A trial court abuses its discretion when its ruling is clearly against the logic of the circumstances and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration. *State v. Brown*, 939 S.W.2d 882, 883 (Mo. banc 1997). Where reasonable persons can differ about the propriety of the action taken by the trial court, no abuse of discretion will be found. *Id.* at 883–84. The defendant bears the burden of showing that there is a "real probability" that he was prejudiced by the abuse of discretion. *Oates*, 12 S.W.3d at 310.

### 2. Voir Dire Restrictions

Johnson complains that his counsel was not allowed to explain to venirepersons that imposition of the death penalty, as opposed to a life sentence, would require that they find him guilty of first-degree murder. During voir dire, defense counsel discussed that first-degree murder would not include self-defense, an accident, or catching a cheating spouse with a lover. The prosecutor objected, arguing that defense counsel was inappropriately attempting to define the crime of first-degree murder. He argued that it was the court's responsibility to instruct the jury and the verdict director would provide jurors with the definition of deliberation and the elements of first-degree murder. Defense counsel explained that her questions were designed to elicit information about whether venirepersons who say they can consider a life sentence mean that they can consider a life sentence for a deliberate killing, not just an accidental killing or for self-defense.

The trial court found that defense counsel's questions did not give venirepersons a "full and complete definition of murder first degree." It found that the questions "invade[d] the province of the court" and were an "improper attempt to instruct the jury on what the law is." The trial court suggested that defense counsel ask, "Can you give life without probation and parole if you find him guilty of first degree murder[?]," rather than attempt to define first degree murder.

### 3. Permissible Voir Dire Questions

In *State v. Morrow*, this Court rejected a defendant's argument that the trial court erred in prohibiting voir dire questions regarding the difference between first and second degree murder because such restrictions prohibited him from intelligently exercising his peremptory and for cause strikes. 968 S.W.2d at 111. This Court found that the trial court did not abuse its discretion in preventing the questions because counsel is not allowed to inform venirepersons as to what law will be applied in the case or what instructions will be given. *Id.* As in this case, the trial court in *Morrow* aided defense counsel in developing an

appropriate alternative to the prohibited line of questioning. *Id.*

In *State v. Hall,* the defendant alleged that the trial court erred in preventing his counsel's questions asking venirepersons if they could recommend a sentence of life imprisonment for a defendant who had "deliberated" and "coolly reflected" before committing a murder. 955 S.W.2d 198, 203 (Mo. banc 1997). This Court found the trial court properly sustained the State's objections to the questions because it is the role of the court to instruct jurors as to the legal definitions regarding intent. *Id.* *Hall* states that "[v]oir dire is not the proper arena for the legal definitions that appear in jury instructions as the venire-panel is not the jury, nor does it have evidence before it." *Id.* The trial court in *Hall* advised defense counsel to limit questioning to whether the venirepersons could consider the full range of punishment for first-degree murder authorized by law. *Id.*

 Johnson cites *State v. Gray,* 887 S.W.2d 369, 379 (Mo. banc 1994), for the proposition that "[i]n order to discover bias of potential jurors, it is often necessary to reveal some factual or legal detail in voir dire." While it is true that the "trial court *may* permit parties to inquire whether potential jurors have preconceived notions on the law which will impede their ability to follow instructions on issues which will arise in the case," such decisions are properly left to the discretion of the trial court. *State v. Ramsey,* 864 S.W.2d 320, 335–36 (Mo. banc 1993) (emphasis added). In *Gray,* the trial judge used hypothetical discussions to explain accessory liability and reasonable doubt to venirepersons. 887 S.W.2d at 378–79. While no plain

error was found in the judge's comments, this Court cautioned that "[d]espite his well-intended purposes, the judge said far more than was necessary in this case" and that it would have been best for the remarks to "[avoid] the appearance of giving an instruction of law or commenting on the evidence." *Id.* at 379. This Court noted that the "purpose of the Approved Jury Instructions is to avoid confusion among jurors [and][t]hat purpose is undermined when a judge or lawyer, under the guise of voir dire, makes what seem to be comments on the law or facts in the case." *Id.* *Gray* warns that "[s]uch commentary during voir dire risks incomplete or inaccurate statements and may conceivably lead to confusion." *Id.*

 The concerns raised by *Gray* were avoided when the trial court prevented defense counsel's discussions about the requirements of first-degree murder. The court's proposed solution—asking "Can you give life without probation and parole if you find him guilty of first degree murder[?]"—adequately permitted defense counsel to determine if venirepersons could consider a life sentence in the case.

The trial court did not abuse its discretion in sustaining the prosecutor's objections to defense counsel's questions during voir dire. Having found no abuse of discretion, this Court need not consider the issue of prejudice. This point is denied.

## C. Evidence of Uncharged Crimes

Johnson asserts that the trial court erred in overruling his defense counsel's objections to testimony of "uncharged crimes of 'stalking'[11] children in the days

11. The State argues that Johnson wrongly characterizes Angel's testimony as evidence of uncharged crimes of "stalking" because her testimony did not show that he had commit-

ted the criminal offense of stalking. This argument, however, is undermined insofar as the prosecutor commented during closing argument that the day before Casey's murder

preceding his crime."[12] He argues that this evidence was inappropriate propensity evidence offered as proof that he deliberated to kill Casey, which prejudiced his defense of diminished capacity.

### 1. Admissibility

The trial court has broad discretion in determining the admissibility of evidence. *Glass*, 136 S.W.3d at 507. The trial court's ruling on the admission of evidence will be reversed only if the court clearly abused its discretion. *Zink*, 181 S.W.3d at 72–73.

Generally, evidence of uncharged crimes, wrongs, or acts is inadmissible for the purpose of showing the defendant's propensity to commit such crimes. *Morrow*, 968 S.W.2d at 107. Although evidence of prior misconduct is inadmissible to show propensity, it is admissible if it is logically relevant, in that it has some legitimate tendency to establish directly the accused's guilt of the charges for which he is on trial, and legally relevant, in that its probative value outweighs its prejudicial effect. *State v. Bernard*, 849 S.W.2d 10, 13 (Mo. banc 1993). An exception[13] to the general rule that evidence of uncharged misconduct is inadmissible "is recognized for evidence of uncharged crimes that are part of the circumstances or the sequence of events surrounding the offense charged." *Morrow*, 968 S.W.2d at 107. Evidence of uncharged crimes is admissible "to present the jury a complete and coherent picture of the charged crimes and to rebut [a defendant's] contention that he lacked the ability to deliberate." *Id.*

Errors in admitting evidence require reversal only when prejudicial to the point that they are outcome-determinative. *State v. Black*, 50 S.W.3d 778, 786 (Mo. banc 2001). "A finding of outcome-determinative prejudice expresses a judicial conclusion that the erroneously admitted evidence so influenced the jury that, when considered with and balanced against all evidence properly admitted, there is a reasonable probability that the jury would have acquitted but for the erroneously admitted evidence." *Id.*

### 2. Evidence Presented

Johnson argues that Angel's testimony was not legally relevant because its probative value was outweighed by its prejudicial effect and was not logically relevant because the alleged "stalking" was unrelated and not similar to the charged offense of murdering Casey.

Johnson's arguments are unpersuasive. Angel testified to events that occurred at Casey's home and on her street only two days before her murder. The evidence countered Johnson's claims that he did not deliberate before killing Casey. Angel's testimony was admissible because it helped construct a complete and coherent picture of Casey's murder by establishing the context for that offense. *See Morrow*, 968 S.W.2d at 107.

Johnson was seen "stalking these little girls inside that house."

**12.** Defense counsel objected to the admission of Angel's testimony that Johnson had followed her and Chelsea while they were riding their bikes on Benton Street two days before Casey's murder and her testimony that she saw Johnson sitting by the deck of Casey's grandfather's home, locked the door, and heard a knock on the door and did not answer it on the day before Casey's murder.

**13.** Other exceptions include use of the evidence "to show motive, intent, absence of mistake or accident, common scheme or plan, or a signature *modus operandi*." *State v. Gilyard*, 979 S.W.2d 138, 140–41 (Mo. banc 1998).

█ Moreover, Johnson fails to demonstrate there was outcome-determinative prejudice from Angel's testimony. Her testimony about seeing Johnson in the days before the murder, and the prosecutor's few remarks about that testimony, pales in the presence of the other evidence in the case. The jury heard evidence of Johnson's confession that he intended to take Casey for the purpose of having sex with her and then kill her. He admitted to taking Casey to an isolated location, burying her body, and attempting to wash evidence from his body. One of Johnson's experts testified on cross-examination that having a mental illness does not necessarily prevent a person from deliberating, and the State's expert witness in rebuttal testified that Johnson was capable of deliberating on the day of Casey's murder. There is no reasonable probability that, but for the evidence that Johnson contests, the jury would have acquitted him.

## D. Voluntary Intoxication Instruction

Johnson asserts that the trial court erred in submitting a voluntary intoxication instruction,[14] Instruction 6, to the jury over his objections. He alleges the instruction was not supported by substantive evidence. He argues that the instruction misled jurors to believe that his defense was an intoxicated or drugged condition at the time of the crime, prejudicing his true defense of diminished capacity.

### 1. Preservation of the Issue

█ Johnson's arguments on appeal are limited to those he stated at trial. *State v. Johnson*, 483 S.W.2d 65, 68 (Mo. 1972). An appellant cannot broaden the scope of his objections on appeal beyond that made in the trial court. *State v. Lindsey*, 80 S.W.2d 123, 125 (Mo.1935) (internal citations omitted). A point is preserved for appellate review only if it is based on the same theory presented at trial. *See State v. Barnett*, 980 S.W.2d 297, 303 (Mo. banc 1998). Unpreserved issues can be reviewed only for plain error. *Glass*, 136 S.W.3d at 507.

█ At trial, defense counsel argued that Instruction 6 was inconsistent with the diminished capacity instruction[15] because the evidence showed that Johnson's drug use produced psychosis. On appeal, Johnson argues that there was not substantive evidence of intoxication to support giving Instruction 6, particularly because evidence of intoxication from statements Johnson made to experts was not admissible as substantive evidence. These arguments on appeal were not raised at trial or in Johnson's motion for new trial.

Johnson argues that, although his arguments at trial and on appeal differ, this point was sufficiently preserved for review because the prosecutor's response to his objection at trial discussed the issue of the evidence presented. He asserts that the prosecutor's arguments formed the basis for the trial court's ruling on his objection and cites *State v. Wandix*, 590 S.W.2d 82,

---

**14.** Based on MAI–CR3d 310.50, Instruction 6 stated: "The state must prove every element of the crime beyond a reasonable doubt. However, in determining the defendant's guilt or innocence, you are instructed that an intoxicated or drugged condition whether from alcohol or drugs will not relieve a person of responsibility for his conduct."

**15.** Instruction 10, the diminished capacity instruction, was based on MAI–CR3d 308.03 and read in part: "The term 'mental disease or defect' means any mental abnormality regardless of its medical label, origin, or source. However, it does not include an abnormality manifested only by repeated antisocial conduct or alcoholism without psychosis or drug abuse without psychosis."

84 (Mo. banc 1979), for the proposition that an issue is sufficiently preserved where the record reflects that the trial court and both parties recognized the issue during the trial.

The trial court, however, did not state a specific basis for rejecting Johnson's objection as to Instruction 6. The record does not reflect that it considered the issue of whether there was substantive evidence to support giving the instruction.

Johnson's arguments as to Instruction 6 are reviewed only for plain error because they were not properly preserved for review.

## 2. Plain Error Review

■■■ Plain error is found only where the alleged error establishes substantial grounds for believing a manifest injustice or miscarriage of justice occurred. *State v. Baker*, 103 S.W.3d 711, 723 (Mo. banc 2003). "To establish that [an] instructional error rose to the level of plain error, appellant must demonstrate that the trial court so misdirected or failed to instruct the jury that it is evident that the instructional error affected the jury's verdict." *Id.*

■■■ Johnson argues that giving Instruction 6 resulted in manifest injustice because it suggested that his defense was an intoxicated condition at the time of the crimes, which distracted jurors from his defense that he was unable to deliberate. He argues that the distraction from Instruction 6 was compounded by the evidence of drugs and alcohol before the jury. Given that this evidence was presented, however, the trial court did not err, plainly or otherwise, in providing an instruction to clarify the jury's consideration of that evidence. Johnson is not entitled to relief on this point.

## E. Statements to Detective Newsham

Johnson alleges that the trial court erred in overruling his motion to suppress statements he made to Detective Newsham because the statements were unreliable and involuntary. He maintains that the admission of the statements prejudiced him because they provided direct evidence of deliberation.

## 1. Standards for Review

■■■ A trial court's ruling on a motion to suppress is reviewed to determine if it is supported by substantial evidence, and it will be reversed only if it is clearly erroneous. *Edwards*, 116 S.W.3d at 530. The evidence is viewed in the light most favorable to the trial court's ruling and deference is given to the trial court's determinations of credibility. *Id.*

## 2. Reliability

■■■ Johnson argues that the trial court should have suppressed the statements because they were unreliable insofar as Detective Newsham's account of when the statements were made conflicted with jail records. He suggests that this conflict demonstrates that Detective Newsham gave false testimony. This argument questions the credibility of a witness. The trial court has the "superior opportunity to determine the credibility of witnesses," and this Court defers to the trial court's factual findings and credibility determinations. *State v. Rousan*, 961 S.W.2d 831, 845 (Mo. banc 1998). The trial court did not clearly err in refusing to suppress Detective Newsham's testimony about Johnson's statements on the grounds of reliability.

## 3. Voluntariness

Johnson further alleges that the statements should have been suppressed because they were involuntary. Johnson ar-

gues that his statements were coerced by Detective Newsham's comments on eternal salvation and were made after he had been in police custody for about 16 hours. In support of his coercion arguments, Johnson states that he failed to complete ninth grade and was in need of medication for his mental illness at the time the statements were made.

 A challenge to the admissibility of a statement on the grounds that it was involuntary puts the burden on the State to show voluntariness by a preponderance of the evidence. *Id.* The test for voluntariness is whether, under the totality of the circumstances, the defendant was deprived of free choice to admit, to deny, or to refuse to answer and whether physical or psychological coercion was of such a degree that the defendant's will was overborne at the time he confessed." *Id.* Factors that are considered include whether the defendant was advised of his rights and understood them, the defendant's physical and mental state, the length of questioning, the presence of police coercion or intimidation, and the withholding of physical needs. *Id.* "Evidence of the defendant's physical or emotional condition alone, absent evidence of police coercion, is insufficient to demonstrate that the confession was involuntary." *Id.*

 Detective Newsham's comments about eternal salvation were not improperly coercive. The comments arose from a discussion about reading and came after Johnson's inquiry about achieving eternal salvation. Detective Newsham's comments were not "threats of harm or promises of worldly advantage" that would render Johnson's confession inadmissible. *See State v. Williamson,* 339 Mo. 1038, 99 S.W.2d 76, 79–80 (1936) (Promises yielding

involuntary confessions must be "promises of 'worldly advantage,' as distinguished from adjurations of a moral or spiritual nature; and they must be direct, as distinguished from collateral.").

 Additionally, Johnson repeatedly waived his rights before making statements throughout the day and did so again before being further questioned by Detective Newsham. Johnson was not questioned constantly throughout the day and he does not allege that he was deprived of his physical needs. Johnson's interview with Detective Newsham lasted only about 20 minutes and was followed by a taped interview lasting only eight minutes. Detective Newsham testified that Johnson did not indicate that he was under any physical, emotional, or mental stress during their conversation, and he did not answer any questions inappropriately.

The totality of the circumstances do not indicate that Johnson's will was overborne at the time he confessed and the trial court did not err in finding that his statements to Detective Newsham were voluntary.

This point is denied.

### F. Statutory Aggravator

Johnson alleges that the trial court erred in submitting Instruction 23 over his objections because it included the "depravity of mind" statutory aggravator,[16] which he argues is "unconstitutionally vague." He contends that he was prejudiced by the vagueness of this aggravator because, had it not been given, the jury would have weighed the aggravating and mitigating factors differently and not recommended the death penalty.

---

**16.** The "depravity of mind" aggravator is based on section 565.032.2(7) and is found in MAI–CR3d 313.40. This Court has found the language of MAI–CR3d 313.40 to be presumptively valid. *State v. Johns,* 34 S.W.3d 93, 115 (Mo. banc 2000).

### 1. Vagueness

Instruction 23 instructed the jury to consider:

Whether the murder of [Casey] involved depravity of mind and whether, as a result thereof, the murder was outrageously or wantonly vile, horrible or inhuman. You can make a determination of depravity of mind only if you find: That the defendant committed repeated and excessive acts of physical abuse upon [Casey] and the killing was therefore unreasonably brutal."

MAI–CR3d 313.40; section 565.032.2(7).

■■■ The limiting language [17] in this instruction, which explains what is required for a determination of "depravity of mind," is taken from the Notes on Use for MAI–CR3d 313.40. *See* MAI–CR3d 313.40, Note 6(B)[2].

■■■ This Court has repeatedly held that the depravity of mind language and limiting instruction, as represented in Instruction 23, provide sufficient guidance to sentencing jurors such that the instruction is not unconstitutionally vague. *Johns*, 34 S.W.3d at 115; *State v. Knese*, 985 S.W.2d 759, 778 (Mo. banc 1999); *State v. Ervin*, 979 S.W.2d 149, 166 (Mo. banc 1998); *State v. Butler*, 951 S.W.2d 600, 605–06 (Mo. banc 1997); *State v. Tokar*, 918 S.W.2d 753, 772 (Mo. banc 1996).

### 2. Limiting Language

■■■ Johnson, however, contends that use of the limiting language is not a cure for the aggravator's vagueness. He argues that the addition of the limiting language improperly usurps legislative power because it adds requirements to section 565.032.2(7) that are not included in the statute. He also maintains that the limiting language wrongly results in judicial fact-finding.

These arguments are without merit. The use of limiting language to clarify the requirements of the statutory aggravator is not an effort by the courts to engage in legislation. The limiting language gives meaning to the words used in the statute and ensures that the statute is constitutionally applied. This is statutory construction, which is clearly in this Court's purview. Further, use of the limiting language does not result in judicial fact-finding. The language expressly instructs the jury to determine if "depravity of mind" was involved based on the evidence in the case.

### G. Penalty Instructions

Johnson alleges the trial court erred in giving Instructions 24 and 26 over his objections because they failed to properly instruct the jury how to weigh the aggravating and mitigating factors.

■■■ This Court will reverse on a claim of instructional error only if there was error in submitting an instruction and it prejudiced the defendant. *Zink*, 181 S.W.3d at 74. MAI instructions are pre-

---

17. The inclusion of limiting language in the "depravity of mind" aggravator reflects an effort to develop objective standards as to what types of murders constitute "depravity of mind," so as to avoid arbitrary and capricious imposition of death sentences, and ensure that the aggravator sufficiently distinguishes cases in which the death penalty is imposed from those in which it is not. *See State v. Griffin*, 756 S.W.2d 475, 489–90 (Mo. banc 1988) (discussing that one of the follow-ing factors must be present before a finding of depravity of mind: the defendant acted with callous disregard for the sanctity of life; physical or psychological torture upon the victim; brutality of defendant's conduct, meaning the murder involved serious physical abuse; mutilation of the body after death; absence of any substantive motive; absence of defendant's remorse; and the nature of the crime, meaning the murder involved serious physical abuse).

sumptively valid and, when applicable, must be given to the exclusion of other instructions. *Id.*

### 1. Instructions

Johnson complains that the instructions were given in error and prejudiced him because they failed to tell the jury what to do if they were tied or not unanimous when weighing aggravators and mitigators. He fails to demonstrate that the instructions were insufficient in this regard.

Instruction 24 was patterned after MAI–CR3d 314.44. It stated in relevant part:

> If you have unanimously found beyond a reasonable doubt that one or more of the statutory aggravating circumstances submitted . . . exists, you must then determine whether there are facts and circumstances in aggravation of punishment.
>
> . . . .
>
> It is not necessary that all jurors agree upon particular facts and circumstances in mitigation of punishment. If each juror determines that there are facts or circumstances in mitigation of punishment sufficient to outweigh the evidence in aggravation of punishment, then you must return a verdict fixing defendant's punishment at imprisonment for life . . . without eligibility for probation or parole.

Instruction 26 was based on MAI–CR3d 314.48. It stated in relevant part:

> If you unanimously decide that the facts or circumstances in mitigation of punishment outweigh the facts and circumstances in aggravation of punishment, then the defendant must be punished for the murder . . . by imprisonment for life . . . without eligibility for probation or parole. . . .
>
> . . . .
>
> If you do unanimously find the existence of at least one statutory aggravating circumstance beyond a reasonable doubt . . . and you are unable to unanimously find that the facts or circumstances in mitigation of punishment outweigh the facts and circumstances in aggravation of punishment, but are unable to agree upon the punishment, your foreperson will complete the verdict form. . . . [And] you must answer the questions on the verdict form. . . .

Johnson also asserts that these instructions prejudiced him because they failed to inform the jury about the proper burden of proof for weighing mitigators against aggravators. He argues that under section 565.030.4(3),[18] the third of four steps for determining whether a defendant is eligible for the death penalty, the jury must be instructed that the State bears the burden of proving beyond a reasonable doubt that the mitigators are insufficient to outweigh any aggravators found.

■■■ This Court has repeatedly rejected the claim that section 565.030.4(3) requires the jury to make a finding beyond a reasonable doubt. *State v. Gill,* 167 S.W.3d 184, 193 (Mo. banc 2005) ("Although section 565.030.4 expressly requires the jury to use the reasonable doubt standard for the determination of whether any statutory aggravators exist, the statute does not impose the same requirement on the determination of whether evidence in mitigation outweighs evidence in aggravation."); *Glass,* 136 S.W.3d at 521; *see also Storey v. State,* 175 S.W.3d 116, 156–57 (Mo. banc 2005).

---

**18.** This statute was amended in 2001. The current version is section 565.030, RSMo Supp.2005, though the language of subdivision 565.030.4(3) has not been altered.

### 2. Plain Error Review

Johnson further requests plain error review of Instructions 24 and 26 on his claims that the instructions were given in error because section 565.030.4(3) requires that only aggravators "found" by the jury be considered and because section 565.030.4(3) does not require the jury to "unanimously" find that mitigators outweigh aggravators. An instructional error rises to the level of plain error only when the appellant demonstrates that the instruction so misdirected or failed to instruct the jury that it is apparent that the error affected the jury's verdict. *Baker,* 103 S.W.3d at 723. Johnson fails to meet this burden.

This point is denied.

### H. Statutory Aggravating Circumstances

Johnson contends that the trial court erred in overruling his motion to quash the information or, alternatively, preclude the death penalty because the State's amended information was insufficient in that it failed to plead any statutory aggravators. Johnson's claim is based on his belief that *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), require statutory aggravators to be included in the charging document so that the offense of aggravated first-degree murder, punishable by death, is distinguished from the offense of non-aggravated first degree murder, which would have a maximum sentence of life without parole.[19]

### 1. Inclusion in Information Not Required

 This Court has repeatedly rejected claims that the information or indictment must include statutory aggravators. *See, e.g., Gill,* 167 S.W.3d at 193–94;[20] *Glass,* 136 S.W.3d at 513; *Edwards,* 116 S.W.3d at 543–44 (Mo. banc 2003); *State v. Gilbert,* 103 S.W.3d 743, 747 (Mo. banc 2003); *State v. Tisius,* 92 S.W.3d 751, 766–67 (Mo. banc 2002); *State v. Cole,* 71 S.W.3d 163, 171 (Mo. banc 2002). "Missouri's statutory scheme recognizes a single offense of murder with a maximum sentence of death, and the required presence of aggravating facts or circumstances to result in this sentence in no way increases this maximum penalty." *Gill,* 167 S.W.3d at 194.

### 2. Notice is Sufficient

Section 565.005.1 requires the state to give the defendant notice "[a]t a reasonable time before the commencement of the first stage of [a capital trial]" of the statutory aggravating circumstances it intends to submit in the event the defendant is convicted of first degree murder. "Notice of statutory aggravating circumstances stands in lieu of charging them in the information or indictment." *Glass,* 136 S.W.3d at 513. Johnson does not allege that he had insufficient notice of the statutory aggravating circumstances in this case.

The trial court did not error in overruling Johnson's motion to quash the information.

---

19. He argues: "Because statutory aggravators authorize an increase in punishment and serve as elements of the greater offense of aggravated first-degree murder, the [S]tate must plead in the charging document the statutory aggravators it will rely on at trial to establish the offense as death-eligible."

20. Johnson's argument mirrors the defendant's argument in *Gill,* wherein this Court rejected the defendant's claim that the information charged only "unaggravated first-degree murder" because it did not include the statutory aggravators later submitted in the penalty phase. 167 S.W.3d at 193–94.

## I. Closing Arguments

Johnson seeks plain error review of his claim that the trial court erred in failing to admonish the prosecutor and give corrective instructions to the jury when the prosecutor remarked in his closing argument that the jury should "for once" hold Johnson responsible for his misconduct.[21] Johnson contends that these remarks improperly asked the jury to base its findings on and punish him for uncharged bad acts. He asserts that the prosecutor's argument wrongly relied on information obtained by mental competency examiners that was prohibited from being used as substantive evidence under sections 552.030.5 and 552.020.14.

### 1. Plain Error Review of Closing Arguments

"Statements made in closing argument will rarely amount to plain error, and any assertion that the trial court erred for failure to intervene sua sponte overlooks the fact that the absence of an objection by trial counsel may have been strategic in nature." *Cole*, 71 S.W.3d at 171. Plain error relief is seldom granted on assertions of error relating to closing argument because absence of an objection and request for relief during closing argument means that any intervention by the trial court would have been uninvited and may have caused increased error. *State v. Silvey*, 894 S.W.2d 662, 670 (Mo. banc 1995). Johnson's plain error claims relating to closing arguments need not be considered unless he shows "there is a sound, substantial manifestation, a strong, clear showing, that injustice or miscarriage of justice will result if relief is not given." *State v. Wood*, 719 S.W.2d 756, 759 (Mo. banc 1986) (internal citations omitted).

It is not necessary to determine the propriety of the prosecutor's closing remarks in this case. When manifest injustice is the standard, improper argument results in reversal of a conviction only if it is established that the argument in question had a decisive effect on the jury's determination. *State v. Wren*, 643 S.W.2d 800, 802 (Mo. banc 1983). The defendant bears the burden to prove the decisive significance. *State v. Parker*, 856 S.W.2d 331, 333 (Mo. banc 1993). In light of the evidence presented in this case, Johnson fails to show how the prosecutor's comments had a decisive effect on the jury's verdict.

## J. Proportionality Review

Johnson asserts the trial court erred in overruling his new trial motion and sentencing him to death because the death sentence in this case is excessive, unreliable, and disproportionate. This claim is addressed as part of this Court's independent proportionality review pursuant to

---

**21.** This issue was not preserved for review because defense counsel did not object to these remarks at trial. The prosecutor's closing argument included:

He's not right .... [A] mentally balanced individual wouldn't do something like that. The question is did it prevent him from knowing and appreciating what he was doing.

. . . .

Absolutely not, absolutely not. When you get to this point, all I'm asking you to do is consider all of that evidence and for once see Johnny—[court interrupts to report time remaining]—for once in his entire life hold him, hold him completely, not partially, not like all the other nonsense he's gone through. Yes, he's [g]ot problems. He's spent his entire life in various deliberate attempts to manipulate the system....

. . . .

I'm asking you for once in his entire life to hold him not just responsible, completely responsible for what he did, murder in the first first (sic) degree, armed criminal action, kidnapping and attempted rape, the only verdicts that are true and just in this particular case.

section 565.035.3, which requires this Court to determine:

(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; and

(2) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in subsection 2 of section 565.032 and any other circumstance found;

(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime, the strength of the evidence, and the defendant.

Section 565.035.3.

## 1. Influence of Prejudice

Johnson argues that the trial court's "serious and prejudicial errors" during both the guilt and penalty phases improperly influenced the jury's verdict and undermined the reliability of the death sentence. As articulated above, however, this Court has found no errors. The non-errors alleged by Johnson did not improperly influence the jury's imposition of the death penalty. Having reviewed the record, this Court finds no evidence suggesting that the punishment imposed was a product of passion, prejudice, or any other arbitrary factor.

## 2. Aggravating Factors

This Court next reviews the trial court's findings to determine if the evidence supports, beyond a reasonable doubt, the existence of an aggravating circumstance and any other circumstance found. The jury found three statutory aggravating circumstances as grounds for considering the death sentence. The jury found that the murder was outrageously or wantonly vile, horrible, or inhuman in that it involved depravity of mind. Section 565.032.2(7).

It also found that the murder was committed while Johnson was engaged in committing the offenses of kidnapping and attempted forcible rape. Section 565.032.2(11).

█ The evidence supports, beyond a reasonable doubt, that Casey's murder was wantonly vile, horrible, or inhuman in that it involved depravity of mind. The jury was instructed that it could make a determination of depravity of mind only if it found Casey's murder was unreasonably brutal because Johnson committed repeated and excessive acts of physical abuse on Casey. The evidence supports such a finding. Casey's head was repeatedly struck with a brick before Johnson dropped a "boulder" on her head.

The evidence also supports, beyond a reasonable doubt, a finding that Johnson murdered Casey while he was engaged in the commission of the offenses of kidnapping and attempted forcible rape.

## 3. Proportionality

Finally, this Court must consider whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering the crime, the strength of the evidence, and the defendant. Johnson maintains that the analysis of "the strength of the evidence and the defendant" must include consideration of the evidence that he was unable to deliberate because he suffers from severe mental illness. He contends that, although the jury found his mental illness "did not diminish his capacity to deliberate, and thus the evidence on that issue may be sufficient to support his conviction for murder," the evidence does not satisfy the Eight Amendment's requirements for imposing the death penalty. He asserts that the evidence showed that his severe mental illness impaired his ability to reason and

control his conduct in the same manner as an offender who suffers from mental retardation, such that he should not be sentenced to death under *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) (execution of the mentally retarded criminal is "cruel and unusual punishment" prohibited by the Eighth Amendment). Johnson further argues that the mitigating evidence of his mental illness weighed against imposition of the death penalty.

The jury rejected Johnson's mental illness defenses and arguments in both the guilt and penalty phases of the trial. Both federal and state courts have refused to extend *Atkins* to mental illness situations. *In re Neville*, 440 F.3d 220, 223 (5th Cir. 2006); *State v. Hancock*, 108 Ohio St.3d 57, 840 N.E.2d 1032, 1059–60 (2006). There is nothing in the record of this case that would justify a different course of action.

■ Johnson urges this Court to consider that a death sentence is disproportionate in his case because other defendants charged with first-degree murder of a child victim have not been sentenced to death. In determining whether the sentence of death is disproportionate compared to similar cases, however, comparison is made to other cases wherein the death penalty was imposed. *Lyons v. State*, 39 S.W.3d 32, 44 (Mo. banc 2001).

This Court has upheld the death sentence in other cases where the defendant presented evidence of mental illness. *See, e.g., State v. Taylor*, 134 S.W.3d 21, 25, 31 (Mo. banc 2004) (paranoid schizophrenia); *State v. Anderson*, 79 S.W.3d 420, 429, 447 (Mo. banc 2002) (severe depression and extreme paranoia); *State v. Harris*, 870 S.W.2d 798, 819 (Mo. banc 1994) (post-traumatic stress syndrome).

The death penalty has also been upheld in cases where the murder involved brutal-ity and abuse that demonstrated depravity of mind. *See, e.g., Strong*, 142 S.W.3d at 728; *Williams*, 97 S.W.3d at 475; *Cole*, 71 S.W.3d at 177; *Knese*, 985 S.W.2d at 779.

The death sentence is consistent with the punishment imposed in other cases where the defendant abducted a young victim and then sexually abused and murdered the victim. *See, e.g., Glass*, 136 S.W.3d at 521; *State v. Ferguson*, 20 S.W.3d 485, 511 (Mo. banc 2000); *State v. Brooks*, 960 S.W.2d 479, 502 (Mo. banc 1997).

■ This case involves the heinous killing of a small child. Johnson admitted that he kidnapped six-year old Casey Williamson and took her to a pit in an abandoned factory. He admitted that he attempted to rape her, struck her head repeatedly with a brick, and dropped a boulder on her head. He admitted that after she stopped breathing he covered her body with rocks and debris and then went to the river to wash away the evidence of his crimes. The death sentence in this case is neither excessive nor disproportionate compared to the penalty imposed in similar cases.

## IV. Conclusion

The judgment is affirmed.